# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **STEWART DEVELOPMENT, LLC** | * | **CIVIL ACTION NO.** |
| | * | |
| **VERSUS** | * | **JUDGE** |
| | * | |
| **111 VETERANS BOULEVARD, LLC** | * | **MAGISTRATE JUDGE** |
| | * | |
| * * * * * * * | * | |

## COMPLAINT

Plaintiff, Stewart Development, LLC, brings this Complaint for declaratory judgment and damages and asserts as follows:

1.

Plaintiff, Stewart Development, LLC ("Plaintiff," "Stewart" or "Ground Lessee"), is a Louisiana liability company with its principal place of business in Jefferson Parish, Louisiana.

2.

Made Defendant herein is 111 Veterans Boulevard, LLC ("Defendant," "111 Veterans" or "Ground Lessor"), a Louisiana liability company with its principal place of business in New Orleans, Louisiana.

## JURISDICTION AND VENUE

3.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332. There is complete diversity of citizenship between Plaintiff and Defendant. For diversity purposes, considering its members, Plaintiff is a citizen of Louisiana and Texas, and to the best of Plaintiff's knowledge, Defendant, considering its members, is a citizen of New York, Massachusetts, and Florida. Additionally, the amount in controversy is greater than $75,000, exclusive of interest and

costs.

4.

Venue is proper in this Court because the property which is subject to the Ground Lease at issue in this suit is located within this district.  Further, pursuant to 28 U.S.C. §1391(b)(2), a substantial part of the events or omissions giving rise to this action occurred in this district.

**FACTUAL BACKGROUND**

**History of the Ground Lease**

5.

Stewart is the owner, developer, and builder of the building and other improvements located at 111 Veterans Memorial Boulevard, Metairie, Louisiana, 70005, more commonly known as Heritage Plaza (collectively, the "Building" or "Heritage Plaza").  Stewart is the lessee of the ground on which the Building is situated and constructed.

6.

111 Veterans is the owner of the land on which Heritage Plaza sits, but has no ownership or other interest in the Building constructed thereon.

7.

The relationship between Stewart and 111 Veterans is governed by that certain Ground Lease dated October 3, 1980; as amended by that certain Act of Amendment of Lease dated April 29, 1981; as amended by that certain Second Amendment to Lease dated February 19, 1982; as subject to that certain Act of Counterletter dated November 2, 1981; as assigned by Frank B. Stewart, Jr. to Stewart Development, a partnership in commendam, by that certain Assignment of Lease dated February 2, 1982; as ratified by that certain Act of Ratification and Correction dated February 19, 1982; as amended by that certain Letter Agreement dated August 10, 1990; as

#4994081v1

assigned by Stewart Development to Stewart Development, LLC by that certain Act of Transfer and Contribution dated April 10, 2003; and as amended by that certain Fourth Amendment of Ground Lease dated April 10, 2003 (the "Fourth Amendment to Ground Lease"), for the ground upon which there currently exists the office building bearing address 111 Veterans Memorial Boulevard, Metairie, Louisiana, 70005 (collectively the "Ground Lease").  A copy of the Ground Lease, as amended, is attached as Exhibit A.

8.

Heritage Plaza is a 19-story Class A office tower encompassing 353,000 rentable square feet.  It is occupied by a variety of high-quality tenants, including law firms, insurance companies, accounting firms, engineering firms, financial planning institutions, medical practices, a high-class restaurant and a large fitness facility.

9.

The Ground Lease was last amended by the Fourth Amendment to Ground Lease in 2003, prior to Hurricanes Katrina and Ida and before the current Louisiana property insurance crisis emerged.

10.

On November 2, 2017, Ground Lessor acquired ownership of the land on which Heritage Plaza sits and assumed the obligations of the lessor under the Ground Lease by that certain Cash Sale of Property by Capital One, National Association, as Trustee of the Margaret Ellen Lauer Charitable Remainder Annuity Trust to 111 Veterans Boulevard, LLC.

#4994081v1

11.

Since entering into the Ground Lease, Stewart has maintained appropriate and reasonable insurance coverage for Heritage Plaza, as required by the Ground Lease.

12.

For example, Stewart obtained and maintained the following insurance limits on the building and garage (exclusive of Business Personal Property and Business Interruption): 2016: $40,000,000 (All Perils); 2017: $40,000,000 (All Perils); 2018: $40,000,000 (All Perils); 2019: $40,000,000 (All Perils); 2020: $40,000,000 (All Perils); 2021: $62,952,212 (All Perils); 2022: $40,000,000 (All Other Perils) / $10,000,000 (Wind).  Further, for each of these years the deductibles were in excess of $10,000 and the Ground Lessor never voiced any concern or complaint nor alleged any breach of the Ground Lease.

13.

Ground Lessor had prior actual knowledge of these insurance coverage limits and deductibles, never raised any issues or objections, and accepted or otherwise approved them.

**Ground Lessor Seeks to Buy Heritage Plaza**

14.

In Fall 2022, Stewart listed Heritage Plaza for sale.

15.

Ground Lessor expressed interest in purchasing the Building and entered into discussions and negotiations with Stewart for the potential purchase.  As part of these discussions and negotiations, Ground Lessor entered into a confidentiality agreement whereby Ground Lessor was privy to certain confidential information for purposes of a potential purchase only.  This confidential information included that the loan secured by the Building had to be re-financed by May 6, 2023.  Ground Lessor was also provided a tour of the Building to facilitate and further the

4

purchase.

16.

Ultimately, purchase discussions reached an impasse and Ground Lessor did not make a formal or written offer to purchase the Building.

**Ground Lessor Implements its Bad Faith Scheme**

17.

Shortly thereafter, on March 16, 2023, Ground Lessor sent a demand letter to Stewart erroneously claiming that Stewart was in violation of the Ground Lease and specifically asserted that Stewart had failed to maintain insurance on the Building in the amounts allegedly required by the Ground Lease and failed to maintain maximum deductibles allegedly set by the Ground Lease. This was the first time that Ground Lessor had ever raised such an issue or contended that the insurance coverage Stewart had in place was allegedly inadequate.

18.

Specifically, Ground Lessor asserted that pursuant to Section 3(g) of the Fourth Amendment of Ground Lease, Stewart was required to maintain property insurance in the amount equal to the total actual replacement cost of the improvements on the land (less some enumerated improvements).

19.

Ground Lessor asserted that Stewart had insurance coverage of only $40,000,000.00, which after considering coverage for personal property and loss of income, equated to coverage of $31,214,465.00 on the improvements. Ground Lessor arbitrarily asserted that its unidentified "insurance consultant and its advisors" had determined the replacement cost of the improvements to be $123,000,000.00, less a minimal depreciation of only 10%, and demanded that Stewart obtain

5

$110,700,000.00 of insurance coverage on the improvements.

20.

Further, Ground Lessor asserted that the current insurance on the improvements contained a deductible for wind/hail coverage of $100,000.00 and a deductible for named storm wind/hail coverage of 7.5% which it claimed to be in violation of the Ground Lease which allegedly required a deductible of no more than $10,000.00.

21.

Ground Lessor claimed that Stewart was in default of the Ground Lease due to these alleged breaches of the Ground Lease and demanded that Stewart cure these breaches in the times allowed by the Ground Lease.

22.

In an intentional or tortious attempt to further inflict damage and harm on Stewart by interfering with its contractual relationships, Ground Lessor notified Stewart's mortgage holder of the alleged default and informed tenants of Heritage Plaza that Ground Lessor would own the Building in sixty days.

23.

By manufacturing this dispute using confidential information learned during its own purchase negotiations which was subject to a confidentiality agreement, Ground Lessor has sought to make itself the only potential purchaser—knowing that no other entity would seek to buy into an on-going dispute with Ground Lessor—and to intentionally disrupt if not destroy any chance that Stewart had to refinance with a third-party lender. In sending the demand letter, Ground Lessor also knew that Stewart would be required to disclose the dispute to any lender or prospective purchaser. Ground Lessor already owns all other "Class A" office tower buildings in

6

Metairie, and is doing whatever it can to wrest control of Heritage Plaza from Stewart, thereby giving itself a monopoly over the market for such office space and the ability to set rent prices at will.

24.

The actions of Ground Lessor were conducted in bad faith and in an attempt to fabricate grounds to evict Stewart, to make Ground Lessor the only viable purchaser, and/or to take control of the Building and obtain a financial windfall.

**Stewart Complied with its Own Lease Obligations**

25.

At all times, Stewart has maintained the insurance coverage required by the Ground Lease, and Ground Lessor's recent demand is unreasonable and in violation of the Ground Lease. Regardless, to avoid the forced eviction threatened by Ground Lessor and with great difficulty and significant economic hardship, Stewart has been able to obtain insurance coverage of $110,700,000.00 on the Building as demanded by Ground Lessor in order to avoid eviction proceedings. Maintaining this level of coverage is not, however, sustainable given the current state of the insurance market in Louisiana. The additional coverage has resulted in an up-front payment of $1,275,450.00 in additional premium costs with the final premium subject to certain conditions and losses. This increased premium will result in hardship to the tenants of Heritage Plaza in addition to Stewart. To the extent current tenants of the Building have a base year in their lease prior to 2023, the additional inflated insurance cost will be passed through to them as a common area expense under their leases with the balance of the expense being a liability to Stewart. This unnecessary and unsupported major additional expense will make it more difficult for Stewart to lease space in the Building due to the resulting increase in operating costs and less

#4994081v1

marketable for sale with a corresponding decrease in value due to the significant reduced profitability of the Building as a result of the additional insurance expense.

26.

Now that Stewart, with great difficulty and expense, obtained the amount of insurance coverage Ground Lessor demanded with the threat of eviction, Ground Lessor now claims that the insurance is not with "financially sound and reputable insurance companies" and that Stewart is a co-insured under the policy, all in alleged violation of the Ground Lease. This is just another example showing Ground Lessor's true intentions and bad faith.

**<u>DECLARATORY JUDGMENT</u>**

27.

The Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and 28 U.S.C. § 2202, permits a federal court, where jurisdiction exists over an actual controversy, the power to "declare the rights and other legal relations of any interested party" seeking a declaration, "whether or not further relief is or could be sought."

28.

Stewart seeks a declaratory judgment that the failure to maintain the insurance at the levels Ground Lessor insists upon is not a breach of the Ground Lease, cannot justify eviction, and is not enforceable. Stewart also seeks a declaratory judgment that Ground Lessor has consented to the reasonable insurance coverage historically maintained by Stewart and that Ground Lessor is estopped from or has waived any objection to insurance coverage since it has not raised an objection until now and/or that through its course of conduct accepting the insurance limits historically obtained by Stewart.

8

29.

Stewart seeks a declaration on the question of construction and validity of provisions of the Ground Lease regarding applicable insurance coverage of the Building and whether the failure to obtain unreasonable levels of coverage and deductibles set by Ground Lessor is a substantial breach of the Ground Lease that can be enforced, resulting in termination or dissolution of the Ground Lease and the eviction of Stewart.

30.

Section 3(g) of the Fourth Amendment of Ground Lease, the only provision of the Ground Lease that the Ground Lessor alleged Stewart was in breach of, states as follows:

(g) The name of the leasehold mortgagee shall be added to the loss payable endorsement of any and all fire and other casualty insurance policies to be carried by Lessor or Lessee in respect of the Demised Premises, and all such policies shall state that the insurance proceeds are to be paid to the leasehold mortgagee. If, under the Ground Lease, such insurance proceeds are required to be made available for the restoration of the Demised Premises, the leasehold mortgagee shall be required to release such proceeds for restoration costs in accordance with its customary procedures for the release of insurance proceeds to borrowers. It under the Ground Lease, any such insurance proceeds are not required to be applied to restoration, such insurance proceeds shall be applied as set forth in the leasehold mortgage. If more than one leasehold mortgagee are named insureds, the insurance proceeds will be paid to the leasehold mortgagee whose leasehold mortgage is prior in lien among those so named. **Whichever party is required to maintain fire insurance on the improvements on the Demised Premises shall keep same insured with financially sound and reputable insurance companies against loss or damage by fire, theft, lightning, windstorm, hail, explosion, riot and civil commotion, aircraft and vehicles, and smoke and such other casualties as are presently included in the so-called Extended Coverage Endorsement; and flood, *if reasonably obtainable*, in amounts sufficient to prevent the insured from becoming a co-insurer within the terms of the insurance policies covering such risks, but in any event in an amount not less than 100% of the actual replacement cost of such improvements (exclusive of excavation foundation costs and costs of underground tanks, conduits, pipes, pilings and other similar underground items), less the actual physical depreciation thereof, and with not more than a $10,000 deductible from the loss payable for any particular occurrence.** Upon request, Lessee shall deliver to the leasehold mortgagee originals or certificates of all such policies. Any rent insurance proceeds shall be applied first to payment of any unpaid obligations under the Ground Lease

9

and thereafter to the payment of any unpaid obligations owing under the leasehold mortgage and any remaining balance to Lessee.
(Emphasis added).

31.

Section 3(g) provides for obtaining of the insurance described only if "reasonably obtainable."

32.

Section 3(g) and other provisions of the Ground Lease establish that Ground Lessor has no insurable interest in the Building.

33.

For instance, Section 20(b) of the Ground Lease confirms that Ground Lessor has no true insurable interest in the Building. Section 20(b) states in pertinent part regarding damage occasioned to the Building, the following:

> Lessee agrees that as herein provided, it will maintain any new building that might be erected upon the leased premises. **Should said building, or any subsequent building erected upon the leased premises, be destroyed or damaged by fire, water, storm, cyclone or other casualty of any kind, whether similar or dissimilar, or by order of the Parish of Jefferson or any other constituted authority, Lessee agrees** to commence the repairs of such building as soon as reasonably practicable after such damage shall occur and thereafter to prosecute that same to completion with due diligence, or, in the alternative, **to commence to demolish the said building within said period of six (6) months** and to prosecute the said demolition to completion with due diligence, and thereafter, Lessee shall have the option, but not the obligation, to erect a new building on the leased premises in accordance with the provisions hereinafter set forth; provided Lessee's obligation to continue to pay the base rental then prevailing shall continue;" [Emphasis added].

34.

As dictated by Section 20(b), in the event the Building were damaged or destroyed, Stewart has the absolute unquestionable right under the Ground Lease (without the consent or approval of Ground Lessor being required) "to commence to demolish the said building." In the event of

10

material damage or destruction of the Building, Stewart would elect to demolish the Building after satisfaction of the leasehold mortgage.

35.

Further, any proceeds of insurance remaining after paying off the debt owed to the holder of the leasehold mortgage would belong to Stewart, NOT to the Ground Lessor. Accordingly, Ground Lessor's unreasonable and inflated replacement cost estimate for the Building set forth in the default letter is irrelevant to the Ground Lessor's insurable or other interest in the Building. Any insurance proceeds in excess of the leasehold mortgage loan balance would inure only to Stewart, not to the Ground Lessor.

36.

As stated above, the language of Section 3(g) states at pertinent part that:

The name of the leasehold mortgagee shall be added to the loss payable endorsement of any and all fire and other casualty insurance policies to be carried by Lessor or Lessee in respect of the Demised Premises, and **all such policies shall state that the insurance proceeds are to be paid to the leasehold mortgagee**. [Emphasis added].

37.

By this language, Ground Lessor has directed that insurance proceeds get paid to the leasehold mortgage lender who, in contrast to Ground Lessor, actually has an insurable interest therein. Section 3(g) further provides in pertinent part that:

If, under the Ground Lease, such insurance proceeds are required to be made available for the restoration of the Demised Premises, the leasehold mortgagee shall be required to release such proceeds for restoration costs in accordance with its customary procedures for the release of insurance proceeds to borrowers. If, under the Ground Lease, any such insurance proceeds are not required to be applied to restoration, such insurance proceeds shall be applied as set forth in the leasehold mortgage. If more than one leasehold mortgagee are named insureds, the insurance proceeds will be paid to the leasehold mortgagee whose leasehold mortgage is prior in lien among those so named.

11

38.

Notably, there is no requirement under the Ground Lease that any insurance proceeds be made available to pay for the restoration of the Building. Any insurance proceeds shall be given to the leasehold mortgage lender and applied as set forth in the loan agreement (not the Ground Lease). The Fourth Amendment to Ground Lease provides that the waterfall for payment of any insurance proceeds "shall be applied first to the payment of any unpaid obligations owing under the Ground Lease and thereafter to the payment of any unpaid obligations owing under the leasehold mortgage, and any remaining balance to Lessee [Stewart]."

39.

Furthermore, during the 99-year term of the Ground Lease, Stewart has the absolute right at its sole discretion to remove or demolish any improvements that may have been constructed on the leased premises. The term "leased premises" is defined on Exhibit "A" of the Ground Lease to be only the land and not any improvements or other constructions that may from time to time be located or constructed thereon. There is no obligation of Stewart in the Ground Lease to return the leased premises to Ground Lessor at the end of the 99-year term of the Ground Lease other than as a cleared site. What improvements remain at the end of the 99-year term of the Ground Lease is what Stewart alone determines, not Ground Lessor. Section 12 of the Ground Lease clearly provides that Stewart is under no obligation to construct a building on the leased premises at any time.

40.

It is the holder of the leasehold mortgage on the Building that has an insurable interest in those improvements, not the Ground Lessor. Stewart's loan agreement with its leasehold mortgage lender, Cantor Commercial Real Estate Lending, L.P. ("Lender"), dated April 16, 2013 ("Loan

Agreement") provides that Stewart, as the borrower, shall maintain comprehensive "All Risk" or "Special Form" insurance on the improvements in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of the Loan Agreement means "actual replacement value (exclusive of costs of excavations) with no depreciation." This level of coverage is comparable to, if not more burdensome than what is set forth in the Ground Lease. Despite this, Lender has recognized the current distress in the global property insurance marketplace and has worked with Stewart by approving lesser coverage limits for the Building, recognizing that the levels called for in the Loan Agreement are not commercially viable at this time without inflicting excessive economic harm on Stewart and devaluing the Building as collateral.

41.

Ground Lessor conveniently ignored and did not mention in its default letter the provision of Section 3(g) of the Fourth Amendment to Ground Lease, qualifying the insurance coverage with the words "if reasonably obtainable." Stewart has acted in good faith in attempting to find and obtain coverage that is reasonably obtainable that protects the interests of the Lender and others.

42.

The availability of commercial property insurance in the past two years has decreased dramatically. Recent hurricanes, combined with a convergence of global events, has created the worst reinsurance rating environment in a generation.[1] In the United States alone, privately insured catastrophic (CAT) losses were just shy of $100 billion.[2]

---

[1] https://www.insurancejournal.com/news/international/2023/01/04/701632.htm.
[2] Facts + Statistics: U.S. catastrophes |III

#4994081v1

43.

Hurricane Ida ranks as the second largest natural disaster in recorded history.  In today's dollars, Hurricane Katrina caused an estimated $90 Billion in damages.  Damages anticipated from Hurricane Ida are near $65 Billion.[3]

44.

CAT losses in 2022 included more than $50 Billion in secondary peril losses, such as hail and fire events, bringing the U.S. total property loss picture to $120 Billion, compared to a 10-year average of $81 Billion.[4]

45.

The *global* property insurance marketplace is composed of a finite number of markets. Property disasters worldwide, whether from hurricanes in Florida or flooding in Australia, affect U.S. insurance pricing.

46.

2022 was a particularly difficult year for the marketplace, driven by a multitude of factors:

- Record inflation
- The war in the Ukraine
- Rising interest rates
- Continuing supply chain issues
- Combination of natural catastrophe (CAT) losses and secondary peril losses
- Hurricane Ian

Loss ratios for most markets have been above 100% each year.

---

[3] Facts + Statistics: U.S. catastrophes |III
[4] https://www.reuters.com/business/environment/hurricanes-floods-bring-120-billion-insurancelosses-2022-2023-01-09/#:~:text=Latest%20Updates&text=Annual%20insured%20losses%20of%20%24100,of%20t he@20previous%20five%20years.

47.

The result of all of this: Insureds and the insurance industry are reeling from continuous, multiple losses year over year.  This has put the market in turmoil and insureds, like Stewart, are left struggling to manage their property programs.

48.

Stewart has struggled in recent years to locate and obtain insurance coverage on the Building subject to the Ground Lease.

49.

In 2022, Stewart was forced to accept a Loss Limit of $40,000,000.  Stewart obtained a Probable Maximum Loss (PML) calculation for loss by hurricane.  Using a 250-year probability, the PML ranged from $4.7M to $8.1M, well below the Loss Limit.  The additional premium to increase the Loss Limit to $110,700,000 would have been at least $500,000 and probably closer $1,000,000 with no benefit to Lender, Ground Lessor or Stewart.

50.

The 2022 program also required a Named Windstorm deductible of approximately $7,725,000.  The premium to reduce the Named Windstorm deductible to $10,000 would have been at least $700,000, if this would have been offered by the underwriters, which it was not.

51.

To address the Named Windstorm deductible, Stewart obtained a "Parametric" policy that would pay on a first-dollar basis (no deductible) $600,000.00 to $3,000,000.00, depending on sustained wind speeds.

52.

Obtaining coverage subject to the Loss Limit and purchasing the Parametric policy were prudent courses of action by Stewart, given the market conditions. These provide the necessary coverages and protections to enable Stewart to honor and perform its obligations under both the Loan Agreement and the Ground Lease in case of a catastrophic event.  Under the policies obtained, Stewart is not a co-insurer under the terms of the policies.  The judicious, commercially reasonable actions Stewart has taken and will continue to take as a result thereof, fully protect the interests of both Ground Lessor and Lender.

53.

Stewart has acted in good faith and has taken reasonable efforts to obtain the insurance coverage demanded by Ground Lessor.  The amount of insurance it previously obtained protected the interests of all involved, including Ground Lessor who has no insurable interest in the Building.  While Stewart was able due to extraordinary efforts, to get the amount of insurance demanded by Ground Lessor, such coverage was not reasonably obtainable, and even though obtained is not sustainable due to its cost and the negative effects and impact it will have on the value of the Building and the increased cost to the tenants of Heritage Plaza.

54.

La. C.C. art. 2014 provides: "A contract may not be dissolved when the obligor has rendered a substantial part of the performance and the part not rendered does not substantially impair the interest of the obligee." Therefore, if Stewart substantially performed its obligations under the Ground Lease as it relates to insurance and there was no substantial impairment to the Ground Lessor, the Ground Lease cannot be dissolved and Ground Lessor can take no action for the alleged breach.  Here, Stewart acted in good faith in previously obtaining insurance that was

16

reasonably available and protected the interest of Ground Lessor.

55.

There was no breach of the Ground Lease.  Even if there was a breach, the breach was not material, the alleged breach was not the fault of Stewart, Stewart was in good faith, and the interests of the Ground Lessor were protected.

56.

Ground Lessor assumed the Ground Lease in November 2017.  It was not until March 2023, after its own purchase negotiations for the Building failed, that Ground Lessor suddenly asserted that the lack of replacement value limits was a breach of the Ground Lease.  Ground Lessor was notified every year of the insurance limits and never objected to the coverage limits. Ground Lessor is estopped from or has waived any objection to the insurance limits by not objecting sooner, and alternatively, has modified the Ground Lease by its course of conduct in accepting the insurance limits obtained for more than five years.

57.

Further, La. C.C. art. 1853 provides in part that "An obligor is not liable for his failure to perform when it is caused by a fortuitous event that makes performance impossible."

58.

The crisis in the current global property insurance marketplace and the events that caused it constitute "fortuitous events" under La. Civ. Code art. 1873 for purposes of the Ground Lease. Furthermore, Section 2 of the Ground Lease states that Ground Lessee's enjoyment of the leased premises may not be disturbed by Landlord due to "acts of God, the Public Enemy and *vis major*." *Vis major* is applicable here because the circumstances surrounding the unprecedented current insurance crisis arose after the date of the Ground Lease, as a result of events that the parties could

not have been able to reasonably predict, prevent, eliminate or avoid and due to which fulfillment of the contact for one or both parties is too difficult, impossible or would inflict excessively great economic loss.

59.

Therefore, Stewart requests that the Court issue a declaratory judgment finding the following as it relates to the Ground Lease, and specifically as to Section 3(g):

a) That the amount of insurance demanded by Ground Lessor is not reasonably obtainable;

b) That the previous limits of insurance obtained by Stewart were reasonably obtainable and did not result in a breach of the Ground Lease because Stewart acted in good faith, obtained insurance that was reasonably obtainable and economically sustainable and which protected the interest of Ground Lessor;

c) That the failure to obtain the limits of insurance demanded by Ground Lessor were not a breach and such limits were not enforceable and thus as long as the prior limits are in place, Ground Lessor can take no action to dissolve the Ground Lease, or evict or take other adverse action against Stewart with regard to the insurance limits in Section 3(g) of the Ground Lease;

d) By accepting the lower limits obtained by Stewart and not objecting for several years, Ground Lessor is estopped from or has waived any objection to the insurance limits obtained by Stewart and through its course of conduct in not objecting as modified the Ground Lease; and

e) That the added coverage acquired by Ground Lessee was unnecessary and Stewart can terminate the policy at will and not be forced to continue or to renew such added coverage in the future.

18

## DAMAGES

60.

Ground Lessor is liable to Stewart for its actions in seeking to force Stewart to obtain unrealistic and unsustainable insurance limits, all in an effort to manufacture a breach of the Ground Lease so it could dissolve the Lease, evict Stewart and obtain ownership of Heritage Plaza costless and uncompensated to Stewart. Ground Lessor has acted in bad faith and with malice in arbitrarily demanding excessive insurance policy limits (which it never required previously) that it knew were not reasonably obtainable, all in an effort to exploit the insurance crisis in Louisiana into the windfall of obtaining Heritage Plaza. Stewart incorporates the previous paragraphs to support the claims below.

### Count 1: Breach of Contract – Failure to Act in Good Faith

61.

La C.C. art. 1983 requires the parties to a contract to act in good faith.

62.

Ground Lessor has not only failed to act with good faith but has acted in bad faith and with malice.

63.

Using confidential information obtained through its own negotiations to purchase the Building and further knowing of the on-going insurance crisis in Louisiana, Ground Lessor has used that fact to attempt to obtain a windfall by demanding an arbitrary and unreasonable replacement cost value for the Building, threatening to terminate and dissolve the Ground Lease and evict Stewart in an attempt to duplicitously obtain the Building. This bad faith is further

19

exemplified by Ground Lessor never having objected to the insurance limits in place since 2017 but now suddenly objecting based on no apparent reason and with no insurable interest at stake.

64.

Ground Lessor's bad faith is in stark contrast to the conduct of the Lender, who actually has an insurable interest, who worked with Stewart by agreeing to reasonable insurance limits. Ground Lessor even failed to explain how it arrived at the unreasonable level of coverage it demanded.

65.

If Ground Lessor were truly concerned about its interest not being protected, in lieu of attempting to terminate the Ground Lease and inflicting severe foreseeable economic harm on Stewart, Ground Lessor has the right under Section 24 of the Ground Lease to obtain such additional coverage and to recover the cost thereof from Stewart, if justifiable, even though as noted above, Ground Lessor has no true insurable interest in the Building.  The only true parties to benefit from such insurance in the event of damage or destruction of the Building are the Lender and Stewart, not Ground Lessor, per the waterfall provisions for the insurance proceeds set forth in Section 21(d) of the Ground Lease as explained above.  Ground Lessor would receive absolutely no part or benefit of any increased insurance proceeds obtained as a result of any force placement by Ground Lessor as Stewart would, in the event of a catastrophic loss, still elect to demolish the Building and retain the additional insurance funds.

66.

Demanding such a baseless stratospheric level of coverage serves no legitimate commercial purpose other than to fabricate a trumped-up unsubstantiated claim pursued in bad faith to terminate the Ground Lease conducted in and, calculated with malicious intent to cause severe

foreseeable financial harm to Stewart in a duplicitous attempt to obtain the Building.

67.

Ground Lessor's bad faith is further evidence by its sending notice of default to Stewart's Lender in an attempt to interfere with that relationship and to create further harm and hardship to Stewart, knowing through confidential information subject to the confidentiality agreement that the Building had to be re-financed by May 6, 2023, and a default under the Ground Lease could hinder or destroy the refinancing or make it more expensive. Additionally, Ground Lessor evidenced its true intent, bad faith and malice by telling tenants of Heritage Plaza tenants that it would own the Building in sixty days.

### Count 2: Detrimental Reliance

68.

As set forth above, Ground Lessor acquired the land on which the Building sits and assumed the Ground Lease in 2017, and since 2017, Ground Lessor has accepted the following reasonable insurance limits in place on the Building (exclusive of Business Personal Property and Business Interruption): 2016: $40,000,000 (All Perils); 2017: $40,000,000 (All Perils); 2018: $40,000,000 (All Perils); 2019: $40,000,000 (All Perils); 2020: $40,000,000 (All Perils); 2021: $62,952,212 (All Perils); 2022: $40,000,000 (All Other Perils) / $10,000,000 (Wind). Further, for each of these years the deductibles were in excess of $10,000 and the Ground Lessor never voiced any concern, objection or complaint nor alleged any breach of the Ground Lease.

69.

It was only in 2023 (when Ground Lessor learned the Building was for sale) that Ground Lessor suddenly demanded that Stewart obtain an unreasonably high amount of insurance coverage, purportedly under the terms of the Ground Lease.

70.

From 2017 through present, Stewart reasonably relied on Ground Lessor's word and conduct in which Ground Lessor accepted, conceded, or otherwise approved of the reasonably obtainable insurance limits set forth above.

71.

Ground Lessor's sudden change in position and its demand that Stewart obtain an unreasonably high amount of insurance coverage has caused Stewart severe monetary damages.

**Count 3: Louisiana Unfair Trade Practices and Consumer Protection Law**

72.

The Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA") generally provides a private right of action to persons claiming a loss of money or property as a result of the use by another person of an unfair or deceptive method, act, or practice in the conduct of any trade or commerce.

73.

La. R.S. 9:1405 declares that any unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. "Trade" or "commerce" means the advertising, offering for sale, sale, or distribution of any services and any property, corporeal or incorporeal, immovable or movable, and any other article, commodity, or thing of value wherever situated, and includes any trade or commerce directly or indirectly affecting the people of the state. La. R.S. 9:1402.

74.

Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive

22

method, act, or practice declared unlawful by R.S. 51:1405, may bring an action individually to recover actual damages.  La. R.S. 9:1409.

75.

As more fully explained above, Ground Lessor has engaged in a bad faith, unfair, deceptive, and unethical scheme in an attempt to inflict financial hardship on Stewart and in the hopes of obtaining the Building through improper manufactured means.  Ground Lessor has demanded an extraordinary amount of insurance coverage, knowing well that it was not reasonably obtainable, in an attempt to inflict severe financial hardship on Stewart so that Stewart would agree to sell the Building to Ground Lessor at less than its market value or to manufacture a "breach" so that Ground Lessor would have an excuse to terminate the Ground Lease, evict Stewart, and obtain the Building at no cost and without compensating Stewart by the use of unfair and deceptive acts or practices.  Ground Lessor had historically acquiesced to the insurance coverage limits from 2017 through present, and it was only upon learning that the Building was for sale that Ground Lessor manufactured a duplicitous scheme whereby it could fabricate a breach of the Ground Lease, evict Stewart, and/or obtain the Building costless and uncompensated to Stewart.

76.

Ground Lessor also engaged in activities to intentionally inflict further harm to Stewart by interfering with Stewart's relationship with both its Lender and the tenants of Heritage Plaza by telling them Ground Lessor would own the Building in sixty days.  Such actions are in violation of LUTPA.

77.

As a result of its use of unfair and deceptive acts and practices described above, Ground Lessor has violated LUPTA.  Therefore, Ground Lessor is liable to Stewart for the cost and expense

it had to expend in seeking to obtain insurance coverage that was not reasonably obtainable, had no nexus with the risk of Ground Lessor and was demanded simply to manufacture a breach of the Ground Lease.  Stewart is also entitled to recover from Ground Lessor the difference in insurance premiums it had to obtain from what it had in place as agreed to by Lender and what Ground Lessor improperly demanded in bad faith.  Stewart is also entitled to recover all of its attorneys' fees and costs as allowed by LUTPA.

**WHEREFORE**, Plaintiff, Stewart Development, LLC, prays that Defendant, 111 Veterans Boulevard, LLC,  be duly served and cited with this Complaint, that this Complaint be deemed good and sufficient, and that after due proceedings the Court issue a declaratory judgment declaring the following as it relates to the Ground Lease, and specifically as to Section 3(g):

a)  That the amount of insurance demanded by Ground Lessor is not reasonably obtainable;

b)  That the previous limits of insurance obtained by Stewart were reasonably obtainable and did not result in a breach of the Ground Lease because Stewart acted in good faith, obtained insurance that was reasonably obtainable and economically sustainable and which protected the interest of Ground Lessor;

c)  That the failure to obtain the limits of insurance demanded by Ground Lessor were not a breach and such limits were not enforceable and thus as long as the prior limits are in place, Ground Lessor can take no action to dissolve the Ground Lease, or evict or take other adverse action against Stewart with regard to the insurance limits in Section 3(g) of the Ground Lease;

d)  By accepting the lower limits obtained by Stewart and not objecting for several years, Ground Lessor is estopped from or has waived any objection to the insurance limits obtained by Stewart and through its course of conduct in not objecting as modified the

Ground Lease;

e)  That the added coverage acquired by Ground Lessee was unnecessary and Stewart can terminate the policy at will and not be forced to continue or to renew such added coverage in the future.

Plaintiff, Stewart Development, LLC, further prays that, there be judgment in favor of Stewart Development, LLC and against Defendant, 111 Veterans Boulevard, LLC, for damages and amounts due as a result of the breach of the Ground Lease and other claims herein, plus treble damages, reasonable attorneys' fees, costs, and all general and equitable relief to which Stewart Development, LLC is shown to be entitled.

Respectfully Submitted:

**CHAFFE McCALL, LLP**

By:  */s/ Amy L. McIntire*
     Robert S. Rooth (La. Bar No. 11454)
     Peter J. Rotolo, III (La. Bar No. 21848)
     Amy L. McIntire (La. Bar. No. 35241)
     1100 Poydras Street
     2300 Energy Centre
     New Orleans, LA  70163-2300
     Telephone: (504) 585-7000
     Facsimile: (504) 585-7075
     Email:  rotolo@chaffe.com
             mcintire@chaffe.com
     ***Attorneys for Plaintiff Stewart Development, LLC***

**Please issue summons to:**

111 Veterans Boulevard, LLC
Through its Registered Agent for Service of Process
Robert M. Steeg
201 St. Charles Avenue, Suite 3201
New Orleans, LA  70170

#4994081v1