### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**STEWART DEVELOPMENT, LLC**                    **CIVIL ACTION**

**VERSUS**                                      **NO. 23-2085**

**111 VETERANS BOULEVARD, LLC**                 **SECTION "O"**

### ORDER AND REASONS

Before the Court are cross motions for summary judgment. Plaintiff Stewart Development, LLC ("Stewart") seeks summary judgment[1] on its request for declaratory judgment on liability, its breach-of-contract claim, and its claim under the Louisiana Unfair Trade Practice and Consumer Protection Act ("LUTPA"). Defendant 111 Veterans seeks partial summary judgment[2] as to the interpretation of Section 3(g) of the Fourth Amendment of the Ground Lease between Stewart and 111 Veterans—the contract provision underlying this dispute. The Court has considered both summary-judgment motions and the summary-judgment record, and hereby denies both motions. But the Court finds, consistent with Stewart's contention, that there is no genuine dispute of material fact that the phrase "if reasonably obtainable" in Section 3(g) modifies all types of insurance listed in Section 3(g), not just flood insurance. This fact will be treated as established in the case.

---

[1] ECF No. 41.
[2] ECF No. 43.

## I.    BACKGROUND

This case arises from a dispute regarding the insurance provisions of a ground lease.[3] Stewart is the owner, developer, and builder of Heritage Plaza ("the building"), an office tower located at 111 Veterans Blvd in Metairie, Louisiana.[4] Stewart leases space in the building to a variety of tenants including law firms, medical practices, and a restaurant.[5] Although Stewart owns the building, since 1980 Stewart has leased the land on which Heritage Plaza sits pursuant to a ground lease.[6]

In 2003, Stewart obtained a commercial loan backed by the building.[7] As a condition of the loan, Stewart's lender required Stewart (as lessee) and the existing lessor to amend the ground lease to include a provision requiring Stewart to maintain certain levels of insurance on the building.[8] Under the amendment, enacted as the "Fourth Amendment of the Ground Lease," Stewart and the lender were named loss payees who would receive insurance proceeds in the event of damage to the building.[9] Because the ground lessor had no ownership interest in the building, the lessor would receive no insurance proceeds in the event of a loss.[10]

In 2017, 111 Veterans acquired the land on which Heritage Plaza sits, and thus assumed the obligations of the lessor pursuant to the ground lease.[11] 111 Veterans is

---

[3] ECF No. 1.
[4] ECF No. 1 at 2 ¶ 5. Heritage Plaza is a 19-story Class A office building encompassing 353,000 rentable square feet. *Id.* at 3 ¶ 8.
[5] *Id.*
[6] *Id.* at 2 ¶ 5; ECF No. 41-2 at 2–3; ECF No. 41-2 at 32–40 (Fourth Amendment of the Ground Lease).
[7] ECF No. 41-2 at 5.
[8] *Id.* at 5–7, 25; ECF No. 41-2 at 32–40 (Fourth Amendment of the Ground Lease).
[9] ECF No. 41-2 at 32–40 (Fourth Amendment of the Ground Lease).
[10] *Id.*; ECF No. 41-3 at 7.
[11] ECF No. 41-3 at 5, 15, 104–114.

part of the Feil Organization ("Feil"), a New-York based company that owns and manages commercial and residential properties in metropolitan areas across the country, including New Orleans.[12] Feil affiliates own the only other Class A office buildings in Metairie: the Lakeway Center and Galleria.[13] Heritage Plaza has been the only non-Feil Class A building in the Metairie commercial market since 2013.[14]

In 2022, several years after 111 Veterans took over the ground lease, Stewart listed Heritage Plaza for sale.[15] 111 Veterans expressed interest in buying the building from Stewart.[16] During purchase negotiations, the parties executed a confidentiality agreement.[17] This agreement stated that 111 Veterans would receive and keep confidential certain information for purposes of vetting the potential purchase.[18] Subject to the agreement, Stewart provided 111 Veterans with sensitive materials, including the fact that Stewart's commercial loan was set to expire in April 2023, and Stewart's "rent rolls."[19] The rent rolls included information on the Heritage Plaza's tenants, their rental rates, and lease expirations.[20] Emails show that, shortly after receiving Stewart's rent rolls, Feil sent the rent rolls to its New Orleans-based

---

[12] *Id.* at 2.

[13] *Id.* at 5; ECF No. 45-4 at 15.

[14] ECF No. 45-4 at 15. The Lakeway Center is a three-building complex. *Id.* at 4; ECF No. 41-2 at 18.

[15] ECF No. 41-3 at 42. Stewart hired Evan Stone of Goodwin Advisors to market the building for sale. ECF No. 41-2 at 22; ECF No. 41-5.

[16] ECF No. 41-3 at 88.

[17] *Id.* at 121–130.

[18] *Id.*

[19] ECF No. 41-3 at 131–225; ECF No. 41-3 at 90–94.

[20] *Id.*

commercial property broker, Corporate Realty, with instructions to steal Stewart's tenants.[21]

Ultimately, purchase negotiations between Stewart and 111 Veterans fell through.[22] The parties could not agree on a price, and 111 Veterans did not make an offer to purchase Heritage Plaza.[23]

On March 16, 2023, not long after negotiations failed, 111 Veterans sent a default letter to Stewart.[24] The letter claimed Stewart had violated the ground lease by failing to maintain insurance coverage on the building and insurance deductibles in amounts required by Section 3(g) of the Fourth Amendment to the Ground Lease.[25] Stewart argues that 111 Veterans' objective was to acquire Heritage Plaza and thereby reduce 111 Veterans' competition in the Metairie office market by (1) manufacturing Stewart's breach of the lease, leading to Stewart's eviction, or (2) inflicting financial harm on Stewart so Stewart would be unable to refinance its commercial loan, giving 111 Veterans the opportunity to purchase the building for a reduced price.[26]

---

[21] ECF No. 41-3 at 272; ECF No. 43-3 at 91.

[22] ECF No 41-3 at 59.

[23] *Id.*

[24] ECF No. 41-3 at 230–31.

[25] *Id.* As discussed further below, 111 Veterans' default letter to Stewart stated that the replacement cost of the building was $123,000,000 and that Stewart was obligated to maintain $110,700,000 in insurance (accounting for a physical depreciation of 10%) along with a $10,000 deductible for property insurance under Section 3(g). *Id.* 111 Veterans alleges that, because Stewart maintained $40 million in property insurance and a deductible exceeding $10,000, Stewart had breached the ground lease and was in default. *Id.*

[26] ECF No. 41-1 at 1, 5.

4

On June 15, 2023, Stewart filed this lawsuit requesting a declaratory judgment and damages.[27] Stewart seeks a declaratory judgment that (1) the amount of insurance demanded by 111 Veterans pursuant to Section 3(g) is not "reasonably obtainable"; (2) "the previous limits of insurance" obtained by Stewart before 2023 "were reasonably obtainable and did not result in a breach of the Ground Lease because Stewart acted in good faith, obtained insurance that was reasonably obtainable and economically sustainable and which protected the interest of [111 Veterans]"; (3) "the failure to obtain the limits of insurance demanded by [111 Veterans was] not a breach" and "thus as long as the prior limits are in place, [111 Veterans] can take no action to dissolve the Ground Lease, or evict or take other adverse action against Stewart"; (4) "[111 Veterans] is estopped from or has waived any objection to the insurance limits obtained by Stewart," and alternatively "through its course of conduct in not objecting [h]as modified the Ground Lease"; and (5) "the added coverage acquired by [Stewart] was unnecessary and Stewart can terminate the policy at will and will not be forced to continue or renew such added coverage in the future."[28] Stewart also seeks damages based on 111 Veterans' alleged bad-faith breach of contract and 111 Veterans' alleged violation of LUTPA.[29] 111 Veterans filed

---

[27] ECF No. 1.

[28] *Id.* at 24–25. In his November 21, 2023 Order & Reasons, Judge Lance M. Africk granted in part and denied in part 111 Veterans' Rule 12(b)(6) motion to dismiss. ECF No. 13. The motion was granted as to Stewart's declaratory judgment claim regarding waiver, a part of number (4) above, but denied as to Stewart's other declaratory judgment claims, including Stewart's claim that the ground lease was modified through 111 Veterans' course of conduct in not objecting to Stewart's insurance coverage. *Id.* at 11–15, 17–18. This case was transferred from Section "I" to Section "O" in December 2023. ECF No. 20.

[29] ECF No. 1 at 19–25 ¶¶ 60–77. Judge Africk's November 21, 2023 order denied 12(b)(6) dismissal of Stewart's breach of contract and LUTPA claims, but granted the dismissal of Stewart's claim for detrimental reliance. ECF No. 13 at 18.

a counterclaim seeking declaratory judgment against Stewart that Stewart breached its obligations under Section 3(g).[30]

This matter is scheduled for a bench trial on November 18, 2024.[31]

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 926 (5th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted).

"In reviewing the record, 'the [C]ourt must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Vote.Org v. Callanen*, 89 F.4th 459, 469 (5th Cir. 2023) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). The Court "resolve[s] factual controversies in favor of the nonmoving party, but only where there

---

[30] ECF No. 15 at 21.
[31] ECF No. 60.

is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Antoine v. First Student, Inc.*, 713 F.3d 824, 830 (5th Cir. 2013) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). And "[w]hen parties file cross-motions for summary judgment, [the court] reviews each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Cooley v. Hous. Auth. of Slidell*, 747 F.3d 295, 298 (5th Cir. 2014) (internal quotations and citation omitted).

In a non-jury case like this, "a district court has somewhat greater discretion to consider what weight it will accord the evidence." *Johnson v. Diversicare Afton Oaks, LLC*, 597 F.3d 673, 676 (5th Cir. 2010) (quotation omitted). If a "[bench] trial on the merits will not enhance the court's ability to draw inferences and conclusions, then a district court properly should draw his inferences without resort to the expense of trial." *Matter of Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991) (quotation omitted); *see also Adriatic Marine, LLC v. Harrington*, 442 F. Supp. 3d 929, 935 (E.D. La. 2020). Of course, "a district court must be aware that assessments of credibility come into sharper focus once live witnesses are heard." *Placid Oil*, 932 F.2d at 398. But "[w]hen deciding a motion for summary judgment prior to a bench trial, the district court has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Johnson*, 597 F.3d at 676 (internal quotations omitted).

## III.   ANALYSIS

Stewart is not entitled to summary judgment on its request for declaratory judgment, its breach-of-contract claim, or its LUTPA claim. However, Stewart has shown that its interpretation of Section 3(g) controls: that is, the phrase "if reasonably obtainable" limits both the flood and non-flood insurance requirements imposed upon Stewart. This will be treated as an established fact in this case. It follows that because no genuine issue of material fact exists as to Stewart's interpretation of Section 3(g), 111 Veterans' countervailing motion for partial summary judgment is denied.

### A. Interpretation of Section 3(g) of the Fourth Amendment of the Ground Lease

Stewart and 111 Veterans both seek summary judgment on their contrary readings of Section 3(g) of the Fourth Amendment of the Ground Lease:

> Whichever party is required to maintain fire insurance on the improvements on the Demised Premises shall keep same insured with financially sound and reputable insurance companies against loss or damage by fire, theft, lightning, windstorm, hail, explosion, riot and civil commotion, aircraft and vehicles, and smoke and such other casualties as are presently included in the so-called Extended Coverage Endorsement*; and flood, if reasonably obtainable*, in amounts sufficient to prevent the insured from becoming a co-insurer within the terms of the insurance policies covering such risks, but in any event in an amount not less than 100% of the actual replacement cost of such improvements (exclusive of excavation and foundation costs and costs of underground tanks, conduits, pipes, pilings and other similar underground items), less the actual physical depreciation thereof, and with not more than a $10,000 deductible from the loss payable for any particular occurrence.[32]

---

[32] ECF No. 41-2 at 35–36 (Section 3(g) of the Fourth Amendment of the Ground Lease) (emphasis added).

Stewart argues that the phrase "if reasonably obtainable" modifies all types of insurance—including fire, theft, lightning, windstorm, and the like—not just flood insurance.[33] 111 Veterans contends that "if reasonably obtainable" applies only to flood insurance.[34]

Whether Stewart in fact breached the ground lease in 2023 depends in part on which of these interpretations controls. If Stewart's interpretation is correct, then Stewart was required to keep coverage levels at "100% of the actual replacement cost . . . less the actual physical depreciation replacement cost," and a deductible of not more than $10,000, for both flood and non-flood insurance only if such coverage was "reasonably obtainable."[35] If 111 Veterans' interpretation is correct, Stewart was required to keep these coverage and deductible levels for non-flood insurance even if such coverage and deductibles were not reasonably obtainable.

According to Stewart, 111 Veterans breached Section 3(g) by placing Stewart in default for failing to maintain these coverage and deductible levels.[36] Stewart argues that 111 Veterans ignored or read out "if reasonably obtainable" from Section 3(g) by insisting that Stewart maintain non-flood insurance levels that are not reasonably obtainable.[37] 111 Veterans contends that Stewart breached Section 3(g) by failing to procure insurance coverage for all non-flood risks at replacement cost, as they are required to do under Section 3(g).[38]

---

[33] ECF No. 41-1 at 12–13.
[34] ECF No. 43; ECF No. 45.
[35] ECF No. 41-2 at 35–36 (Section 3(g) of the Fourth Amendment of the Ground Lease)
[36] ECF No. 41-1 at 12–19.
[37] *Id.*
[38] ECF No. 45 at 19–21.

Both parties agree that from 2017 (when 111 Veterans first assumed the ground lease) until 2021, Stewart maintained approximately $40 million of insurance coverage for the building, with deductibles over $10,000 for wind and named-storm coverage.[39] Stewart claims that 111 Veterans accepted Stewart's insurance coverage year-after-year and never questioned these amounts until it defaulted Stewart on March 16, 2023.[40] At that time, according to Stewart, 111 Veterans claimed Stewart was in breach for failing to maintain over $110 million of casualty insurance coverage, the amount allegedly equal to the replacement cost of the building (less depreciation of 10%), as well as for having deductibles over $10,000.[41] 111 Veterans does not dispute that 111 Veterans never raised the adequacy of Stewart's insurance coverage before placing Stewart in default.[42]

### 1. Plain Language of Section 3(g)

The parties previously litigated the meaning of Section 3(g) before Judge Africk, who found the provision's language to be "ambiguous."[43] In its Rule 12(b)(6) motion before Judge Africk, 111 Veterans argued that the placement of a semicolon before the words "and flood," applying the last-antecedent rule, supported its reading that "if reasonably obtainable" applies only to flood insurance.[44] Stewart argued conversely—and maintains now—that the series-qualifier canon instructs that "if

---

[39] ECF No. 41-10 at 11; ECF No. 43-12–14.
[40] ECF No. 41-1 at 3-4.
[41] *Id.* at 8; ECF No. 41-3 at 230–31.
[42] *Id.* at 64; ECF Nos. 43, 45, 50.
[43] ECF No. 13 at 10.
[44] ECF No. 7-1 at 8–11. 111 Veterans appears to abandon this argument in its response to the motion for summary judgment, instead arguing that this section of Court should simply affirm Judge Africk's finding that the plain language of Section 3(g) is ambiguous. ECF No. 45 at 15–17.

reasonably obtainable" modifies all of the listed insurance types preceding the semicolon, not just flood insurance.[45]

This Section of the Court agrees with Judge Africk's determination that Section 3(g), on its face, is anything but "clear and explicit."[46] When interpreting a contract, the Court must first determine whether the language is "clear and explicit." LA. CIV. CODE. ANN. art. 2046. In his November 21, 2023 Order & Reasons, Judge Africk performed extensive analysis of the parties' competing arguments and the interpretive rules upon which those arguments relied, and found that the language of Section 3(g) was simply ambiguous.[47] Judge Africk noted that "[i]t is not clear from the text of Section 3(g) whether flood insurance is an integrated part of the series of different kinds of insurance, or a type of insurance set apart."[48] Neither the series-qualifier canon nor the last-antecedent rule resolves the ambiguity.

### 2.  Intent and Historical Meaning of Section 3(g)

Because the contract's language is ambiguous, the Court must then look beyond the language to clarify its meaning. When a contract is ambiguous, "the agreement shall be construed according to the intent of the parties" under Louisiana law. *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007) (internal quotations omitted). "Intent is an *issue of fact* which is to be inferred from all of the

---

[45] ECF No. 9 at 10; ECF No. 41-1 at 13–14.

[46] ECF No. 13 at 10.

[47] *Id.* at 9–10 ("As the clause is written, however, and at this early stage in the litigation, the Court cannot conclude based on the semicolon that the phrase 'reasonably obtainable' modifies only the obligation to procure flood insurance based on the presence of a single semicolon in the sentence."). *Id.* at 9.

[48] *Id.* at 10.

surrounding circumstances." *Id.* (citing *Kuswa & Assocs., Inc. v. Thibault Constr. Co.*, 463 So.2d 1264, 1266 (La. 1985) (affirming that trial judge's factual finding as to intent was reasonably inferred from the circumstances surrounding the contract and was adequately supported by credible evidence in the record). "[T]he intent of a party in entering into a contract can [also] be determined by how it operates under the contract." *Total Minatome Co. v. Union Tx. Prods. Co.*, 766 So.2d 685, 689–691 (La. Ct. App. 2d Cir. 2000) ("One of the best ways to determine what the parties intended in a contract is to examine the method in which the contract is performed, particularly if performance has been consistent for a period of many years."). "A doubtful provision must be interpreted in light of . . . the conduct of the parties before and after the formation of the contract[.]" LA. CIV. CODE. ANN. art. 2053.

Stewart contends that the intent of the parties was for the phrase "if reasonably obtainable" to apply to all types of casualty insurance, not just flood.[49] Based on the history of the parties' conduct under Section 3(g), the Court agrees.

The Fourth Amendment of the Ground Lease, which contains Section 3(g), was enacted on April 10, 2003.[50] The signatories to the Fourth Amendment of the Ground Lease were (1) the lessor and owner of the land under Heritage Plaza, "a trustee under the will of Margaret E. Lauer," and (2) the lessee, Stewart.[51] Stewart contends and 111 Veterans does not dispute that the amendment was drafted because Stewart

---

[49] ECF No. 41-1 at 15–16.
[50] ECF No. 41-2 at 32–40 (Fourth Amendment of the Ground Lease).
[51] *Id.* Stewart has leased the land under Heritage Plaza pursuant to a ground lease since 1980. *Id.*

was seeking a commercial loan.[52] Stewart's lender required the amendment to ensure both Stewart and the lender would receive insurance proceeds in the event the building was damaged.[53] Attorneys for Stewart, the trust, and the lender worked together "to come up with the fourth amendment to protect the lender."[54] Under the amendment (and specifically, Section 3(g)), none of the insurance proceeds would flow to the ground lessor.[55] Thus, at the time the amendment was adopted in 2003, the existing lessor—111 Veterans' predecessor under the agreement—had no direct financial interest in the insurance provision.[56]

111 Veterans did not then become a party to the ground lease until it acquired the land in 2017.[57] But in reviewing the record pre-2017, the Court sees no evidence that the lender or prior lessor required Stewart to maintain non-flood insurance coverage at replacement cost levels. On the contrary, in 2013, the building was appraised at $40 million.[58] At that time, Stewart's insurance broker ran a report indicating that the "insurable value (replacement cost)" of the building was nearly $50 million.[59] Stewart's lender, who had required the insurance language in Section 3(g), explicitly approved Stewart to insure the building for its $40 million appraised value—even though that was nearly $10 million less than the building's replacement

---

[52] ECF No. 41-1 at 2; ECF No. 41-2 at 5–6.
[53] *Id.* at 6–7.
[54] *Id.*
[55] ECF No. 41-2 at 32–40 (Fourth Amendment of the Ground Lease).
[56] *Id.*
[57] ECF No. 41-3 at 104–14.
[58] ECF No. 47-1 at 11.
[59] ECF No. 47-5 at 21.

cost.[60] Thus, with the lender's permission in 2013, Stewart was able to maintain insurance coverage in amounts less than the building's replacement cost.[61]

111 Veterans argues that "private discussions" between Stewart and its lender in 2013 are not germane to the interpretation of Section 3(g) in 2023.[62] On the contrary, the performance of the parties before 111 Veterans assumed the ground lease is compelling evidence of the intent of Section 3(g). That intent was to allow Stewart to maintain coverage limits less than the replacement value of the building—a practice that appears to have been acceptable to the prior lessor.[63] Significantly, when 111 Veterans assumed the ground lease in 2017, the prior lessor certified to 111 Veterans that Stewart was in compliance with the ground lease, including Section 3(g).[64] 111 Veterans accepted this certification.[65]

Further contrary to 111 Veterans' interpretation of Section 3(g), records reflect that neither the prior lessor nor 111 Veterans ever required a deductible of $10,000 or less for non-flood insurance. Under 111 Veterans' reading of Section 3(g), Stewart must maintain deductibles of not more than $10,000 for non-flood insurance even if those deductibles are not reasonably obtainable.[66] But insurance certificates show that, between 2013 and 2022, Stewart routinely carried deductibles well over $10,000

---

[60] ECF No. 41-2 at 14; ECF No. 47-5 at 13–15.
[61] *Id.*
[62] ECF No. 50 at 5.
[63] ECF No. 41-2 at 14; ECF No. 47-5 at 13–15.
[64] ECF No. 41-3 at 16–19, 107.
[65] *Id.*
[66] ECF Nos. 43, 45, 50.

for wind and named-storm coverage.[67] For years, 111 Veterans received these certificates of insurance and never questioned Stewart's compliance with Section 3(g).[68] Despite being on notice that Stewart maintained deductibles exceeding $10,000, 111 Veterans did not default Stewart until 2023, conveniently at a time when 111 Veterans was considering purchasing the building.[69] This suggests that the parties intended to read Section 3(g) consistent with Stewart's interpretation: that a $10,000-or-less deductible for non-flood insurance was not a firm mandate, but required only "if reasonably obtainable."[70] This, in turn, supports Stewart's interpretation of Section 3(g) that "if reasonably obtainable" applies to both flood and non-flood insurance coverage limits.

111 Veterans effectively ignores the history and pattern surrounding its acceptance of Stewart's deductible amounts, and instead focuses the Court on Stewart's insurance coverage. 111 Veterans claims that it believed Stewart was maintaining insurance coverage at the replacement cost value every year until 2023, the year it defaulted Stewart. According to 111 Veterans, this belief was based on the certificates of insurance Stewart sent to 111 Veterans each year between 2017 and

---

[67] ECF No. 43-8 at 2–4 (2013–2014); ECF No. 43-9 at 1 (2014–2015); ECF No. 43-10 at 1 (2015–2016); ECF No. 43-11 at 1–2 (2016–2017); ECF No. 41-3 at 115 (2017–2018); ECF No. 41-10 at 11 (2018–2019); ECF No. 41-3 at 116 (2019–2020); ECF No. 41-2 at 31 (2021–2022).

[68] ECF No. 41-3 at 34.

[69] *Id.* at 230–31.

[70] At the October 4, 2024, oral argument on these motions, 111 Veterans tried to justify not requiring deductibles of $10,000 or less between 2018 and 2022 by noting that such deductibles were "impossible" in the current insurance market. ECF No. 63. But 111 Veterans took a remarkably different stance in its March 2023 default letter, specifically citing Stewart's failure to maintain deductibles of no more than $10,000 as a grounds for default, with no mention of the fact that such deductibles may have been impossible to obtain in the market. ECF No. 41-3 at 230–31.

15

2022.[71] The certificates showed that Stewart maintained casualty insurance coverage of approximately $40 million from 2017 through 2021,[72] and almost $63 million in 2021/2022.[73] 111 Veterans points out that the certificates themselves label these dollar values as "Building, Special (including theft) – Detail, Replacement Cost,"[74] suggesting the values reflect the replacement value of the building. And according to 111 Veterans, because the certificates of insurance were the sole communications from Stewart regarding the building's insurance coverage, 111 Veterans believed Stewart was insuring the building up to the replacement value as required by Section 3(g).[75]

But testimony from both parties' insurance agents tells a different story. Anderson Baker, Stewart's insurance agent, explained that "replacement cost" as used in the certificates simply referred to how an underwriter or insurer would adjust a specific loss incident—meaning, a loss would be adjusted up to its replacement cost, not its actual cash value or depreciated value.[76] Baker was clear that the term "replacement cost" on the certificates was not the replacement value of the entire building.[77] 111 Veterans' insurance expert agreed, confirming that "replacement cost" refers to how a specific loss incident is adjusted by an underwriter or insurer:

---

[71] ECF No. 41-3 at 115 (2017–2018); ECF No. 41-10 at 11 (2018–2019); ECF No. 41-3 at 116 (2019–2020); ECF No. 41-2 at 31 (2021–2022). 111 Veterans' corporate representative, Eric Lowenstein, stated that he believed the certificates were received and not reviewed, but that 111 Veterans began asking questions about Stewart's insurance in 2023. ECF No. 41-3 at 34.
[72] ECF No. 41-3 at 115 (2017–2018); ECF No. 41-10 at 11 (2018–2019); ECF No. 41-3 at 116 (2019–2020).
[73] ECF No. 41-2 at 31 (2021–2022).
[74] ECF No. 43-1 at 13.
[75] *Id.*
[76] ECF No. 47-6 at 6.
[77] *Id.* at 6–7.

"Replacement cost is about the terms in which a loss would be adjusted as replacement cost versus actual cash value."[78]

Furthermore, 111 Veterans should have known the "replacement cost" on the certificates was not the same as the actual replacement value of the building. In 2018, 111 Veterans' own insurance broker, Jason Provenzano, ran a valuation report calculating the replacement value of Heritage Plaza to be $80,187,954.[79] That year, the insurance coverage, or "replacement cost," on the certificate of insurance was $40 million.[80] The Feil Organization would have had access to this valuation report, according to Provenzano.[81] He explained that this report would "typically" be sent to Feil to "review the values and make sure [Feil] was in agreement."[82] And because requesting this valuation report is "generally the practice" when looking at a new property, Provenzano "assume[d]" that this report would have been shared with Feil.[83] The timing of Provenzano's report, produced on February 22, 2018, indicates that 111 Veterans had notice as early as 2018 that there was a potential gap between Stewart's insurance coverage and the replacement value of Heritage Plaza—which is consistent with Stewart's reading of Section 3(g) that "if reasonably obtainable" was a condition placed on both flood and non-flood insurance requirements.[84]

---

[78] ECF No. 47-4 at 14–16.

[79] ECF No. 47-7 at 22. This CoreLogic Valuation Report was based on the building's reconstruction value. The report also lists "Broadwall Management" and Heritage Plaza under the "business" and "location" sections of the report. Broadwall Management is a subsidiary of Feil.

[80] ECF No. 41-3 at 115 (2017–2018); ECF No. 41-10 at 11 (2018–2019).

[81] ECF No. 47-7 at 6.

[82] *Id.*

[83] *Id.*

[84] 111 Veterans contends that nothing in the record indicates that this valuation report was obtained or reviewed by Feil. ECF No. 50 at 9.

111 Veterans separately argues that the replacement value of the building was contained within a document called a "Statement of Values." Baker, Stewart's agent, described the Statement of Values as a "table listing the locations [and] the insured or to be insured values of the building[.]"[85] The Statement of Values "is designed to tell the underwriter what his or her total might be on a particular account."[86] Its purpose is to ensure "the values are accurate or what the insured wants to purchase insurance for."[87] Based on this description, which is uncontested by 111 Veterans,[88] the building value listed in the Statement of Values appears to be functionally equivalent to the "replacement cost" in the certificates of insurance—in other words, the insurance coverage on the building, not the actual replacement value of the building. In fact, 111 Veterans acknowledges that the building values in the Statement of Values were the same values reflected in the certificates of insurance.[89]

Two Statements of Values are included in the summary-judgment record, neither of which proves 111 Veterans' contention that Stewart maintained insurance coverage at the building's replacement value. First, in 2013 Stewart's insurance agency prepared a Statement of Values listing the building's value at $40 million, as determined by the "replacement cost" valuation method.[90] 111 Veterans notes that this value is consistent with the "replacement cost" on that year's certificate of

---

[85] ECF No. 47-6 at 2.
[86] *Id.*
[87] *Id.* at 3.
[88] ECF No. 50.
[89] ECF No. 43-1 at 14.
[90] ECF No. 43-7 at 8.

insurance.[91] However, as noted above, $40 million was the *appraised* value of the building in 2013; the actual replacement cost of the building, as determined by Stewart's insurance broker, was approximately $50 million.[92] Second, a 2021 Statement of Values shows the total insured value of the building to be $62,952,212, which matches the "replacement cost" on the 2021/2022 certificate of insurance.[93] But the 2021 Statement of Values makes no reference to "replacement cost." And even if the replacement value of the building in 2021 was $62,952,212, matching the insurance coverage, this alone does not prove that Stewart was *obligated* under Section 3(g) to maintain insurance coverage at the replacement value.

111 Veterans goes further to claim that the 2022/2023 policy year was the first year that the replacement cost and insurance limits diverged.[94] Indeed, the certificate of insurance for that year showed, for the first time, the replacement cost (over $90 million) exceeding the building's coverage limits ($40 million).[95] Not coincidentally, according to 111 Veterans, 2022/2023 was the policy year in which 111 Veterans defaulted Stewart.[96]

But it is the very timing of the default letter, in March 2023, that further undermines 111 Veterans' claim that Stewart failed to meet its insurance obligations under Section 3(g). For many years, Stewart and 111 Veterans had been competitors

---

[91] ECF No. 43-1 at 11–12.
[92] ECF No. 43-7 at 8.
[93] ECF No. 43-16.
[94] ECF No. 43-1 at 13.
[95] ECF No. 41-3 at 117, 119 (2022–2023).
[96] *Id.* at 230–31.

in the Metairie commercial real estate market.[97] In or around April 2022, Stewart shared with 111 Veterans that it was selling Heritage Plaza.[98] 111 Veterans expressed interest in purchasing the building.[99] In May 2022 Stewart and 111 Veterans entered into a confidentiality agreement, pursuant to which Stewart shared sensitive and confidential business information with 111 Veterans.[100] The confidential information included its tenant rent rolls, as well as the fact that Stewart's loan on the building was set to expire in April 2023.[101] Emails from within the Feil Organization show that, within days of receiving this information, Feil discussed leveraging the information to gain a competitive advantage against Stewart and improve its own position in the Metairie commercial real estate market.[102] 111 Veterans' default letter followed in March 2023.[103] Importantly, prior to Stewart's decision to sell the building, 111 Veterans never raised concerns about the adequacy of Stewart's insurance coverage.[104] For many years 111 Veterans approved Stewart's coverage of approximately $40 million, with deductibles over $10,000, without raising an objection.[105] It is dubious to say the least that 111 Veterans would send the default letter to Stewart, citing its never-before-articulated interpretation of Section 3(g), at a time when 111 Veterans was in a position to gain a competitive advantage against Stewart by leveraging that interpretation.

---

[97] ECF No. 41-6 at 10.
[98] ECF No. 41-3 at 42.
[99] *Id.*
[100] ECF No. 41-3 at 121–130.
[101] *Id.* at 44–49, 90–94, 131–225.
[102] *Id.* at 272, 275, 281.
[103] *Id.* at 230–31.
[104] *Id.* at 34.
[105] *Id.*

Furthermore, 111 Veterans' interpretation of Section 3(g) defies simple logic. At the time of Section 3(g)'s drafting, there would have been no obvious incentive for the ground lessor to limit "if reasonably obtainable" to Stewart's flood insurance. If Stewart were forced to obtain exorbitant or "unreasonable" insurance coverage, it would struggle to maintain its obligations as a ground lessee; this could undermine the viability of the contract. "Louisiana courts will not interpret a contract in a way that leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit." *Richards Clearview, L.L.C. v. Target Corp.*, No. CIV.A. 03-1851, 2004 WL 241693, at *3 (E.D. La. Feb. 6, 2004). The Court finds that reading "if reasonably obtainable" with a limited application would lead to an "unreasonable consequence" and an "absurd result." *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 218 (5th Cir. 2007) (declining to follow an interpretation of the word "flood" in a contract where that interpretation would lead to an absurd result).

This is especially true considering the volatility of the insurance market. The ground lease was enacted in 1980 for a 99-year period.[106] Over that time, it is reasonable to expect the local insurance market to fluctuate from hard (difficult to insure) to soft (easier to insure), and back again.[107] Insurance limits and deductibles available in one year may not be available in another year over a lease term of 99 years.[108] And it is logical that the original parties to Section 3(g) would have

---

[106] ECF No. 1-1 at 4.
[107] ECF No. 47-4 at 4–5.
[108] *Id.*

anticipated this volatility for both flood and non-flood insurance and, in the interest of preserving the lease, sought to limit Stewart's insurance requirements to what is "reasonably obtainable."[109]

Thus, after considering the record, the parties' arguments, and applicable Louisiana law, the Court finds that Section 3(g) is ultimately not susceptible to more than one reasonable interpretation—Stewart's reading is the correct one. The same evidence offered by the parties in summary judgment, presented to the Court as trier of fact in a trial, could not possibly lead to a different result. The Court finds the phrase "if reasonably obtainable" was meant to modify *all* types of insurance listed in Section 3(g), not just flood insurance. This fact is not genuinely in dispute and will be treated as established in this case. *See* FED. R. CIV. P. 56(g).

## B. Stewart's Claims for Declaratory Judgment

Having determined the scope of Section 3(g)'s insurance requirement, the Court next considers whether Stewart is entitled to summary judgment on liability for declaratory judgment.[110] Because there is a genuine dispute of material fact as to whether non-flood insurance was "reasonably obtainable" at the time of default, summary judgment is not appropriate on Stewart's claim for declaratory judgment.

---

[109] 111 Veterans contends that non-flood insurance at replacement value was generally available in 2003, but the availability of flood insurance at replacement value pre-Katrina was "murkier." ECF No. 43-1 at 8–10. 111 Veterans further reasons that these market conditions explain why the original parties to Section 3(g) would have required replacement value limits for non-flood insurance, but not for flood insurance. *Id.* This is pure speculation. There is no evidence that in 2003 Stewart, its lender, and the prior lessor all intended to treat flood insurance differently and impose an obligation on Stewart to maintain non-flood insurance in amounts that are unreasonable to obtain.

[110] ECF No. 1 at 18. In its motion for summary judgment, Stewart notes that it is seeking summary judgment on liability only and requests that damages be reserved for trial. ECF No. 41-1 at 25.

Stewart seeks declaratory judgment on his claims that (1) the amount of insurance demanded by 111 Veterans is not "reasonably obtainable"; (2) "the previous limits of insurance obtained by Stewart were reasonably obtainable" and did not result in a breach because "Stewart acted in good faith, obtained insurance that was reasonably obtainable and economically sustainable and which protected the interest of [111 Veterans]"; (3) "the failure to obtain the limits of insurance demanded by [111 Veterans was] not a breach and such limits were not enforceable," and "as long as the prior limits are in place, [111 Veterans] can take no action to dissolve the Ground Lease, or evict or take other adverse action against Stewart" as to Section 3(g); (4) "through its course of conduct in not objecting[, 111 Veterans] [h]as modified the Ground Lease"; and (5) "the added coverage acquired by [Stewart] was unnecessary and Stewart can terminate the policy at will and will not be forced to continue or renew such added coverage in the future."[111] To determine whether Stewart is entitled to summary judgment on these declarations, the Court must consider, as a starting point, whether non-flood insurance coverage at replacement cost levels was in fact reasonably obtainable both before and at the time of default in 2023.

The parties disagree on this question. Stewart points to testimony from Anderson Baker, Stewart's insurance broker, that he sought coverage of approximately $110 million for Heritage Plaza from mutiple underwriters and brokers in 2023, and that these limits were unavailable.[112] Baker also stated that no

---

[111] ECF No. 1 at 24–25.
[112] ECF No. 41-9 at 4–5.

similarly-insured building was able to obtain such limits on a single building.[113]
Similarly, Stewart claims that 111 Veterans' insurance broker was unable to find
insurance coverage for the building in 2023 even up to the $40 million Stewart
already had in place.[114] 111 Veterans disagrees, noting that its insurance expert,
Timothy Gold, has opined that "all other perils" coverage at full replacement cost was
available at a reasonable cost.[115] Moreover, 111 Veterans points out that, in Stewart's
own complaint, Stewart acknowledges that "[t]he additional premium to increase the
Loss Limit to $110,700,000 would have been at least $500,000 and probably closer
$1,000,000 with no benefit to Lender, Ground Lessor or Stewart."[116] Whether such
additional premium is reasonable or unreasonable has not been established through
summary-judgment evidence.

Given the factual disagreement, the Court will be in a better position at trial
to consider the replacement cost of Heritage Plaza, what types and levels of insurance
coverage were reasonably available to Stewart before and as of March 16, 2003, and
the costs of that coverage. In turn this will allow the Court to evaluate Stewart's
claims for declaratory judgment, including whether the insurance demanded by 111
Veterans was reasonably obtainable, whether Stewart's failure to obtain those limits
was a breach of the ground lease, whether 111 Veterans' alleged failure to object to
Stewart's insurance coverage amounted to a contract modification, and whether

---

[113] *Id.* at 5.
[114] ECF No. 41-8 at 24–26.
[115] ECF No. 45-33 at 4–5 ("Special form, replacement cost, full limits property terms for perils other than flood and wind are available at a reasonable market cost.")
[116] ECF No. 1 at 15 ¶ 49.

Stewart's captive cell policy was unnecessary and otherwise compliant with Section 3(g). For these reasons, summary judgment on Stewart's declaratory judgment claims is inappropriate.

## C. Stewart's Breach-of-Contract Claim

Stewart argues that 111 Veterans breached Section 3(g) by defaulting Stewart for failing to maintain insurance coverage that 111 Veterans knew was "impossible" to obtain.[117] 111 Veterans rejoins that "substantial evidence" exists that Stewart was indeed in default of Section 3(g) given the reasonable obtainability of non-flood insurance, specifically "all other perils" coverage.[118] As previously discussed, there is a genuine issue of material fact as to whether such coverage was reasonably obtainable. If coverage was reasonably obtainable as alleged by 111 Veterans, Stewart may have been in default. If not reasonably obtainable, 111 Veterans may have indeed breached the lease by placing Stewart in default. On the existing summary-judgment record, the Court is unable to make that determination, and accordingly, the Court need not yet reach the question whether 111 Veterans acted in bad faith. These are questions for trial.

## D. Stewart's LUTPA Claim

Stewart also seeks summary judgment on its LUTPA claim.[119] Stewart argues that the same conduct by 111 Veterans that supports its breach-of-contract claim also supports a LUTPA violation.[120] Stewart argues that 111 Veterans inflicted financial

---

[117] ECF No. 41-1 at 12–13, 17–19.
[118] ECF No. 45 at 19–21.
[119] ECF No. 41.
[120] ECF No. 1 at 22–24 ¶¶ 72–77.

hardship on Stewart by requiring it to obtain "extraordinary" levels of coverage.[121] Stewart claims that this financial hardship was intended to cause Stewart, 111 Veterans' competitor in the Metairie office market, to sell the building to 111 Veterans for a lower price.[122] Stewart further contends that 111 Veterans manufactured a breach of the ground lease by mandating Stewart secure higher coverage as a means to evict Stewart and take over the building.[123] Moreover, Stewart contends that Stewart provided confidential business information to 111 Veterans pursuant to a confidentiality agreement, and 111 Veterans then shared that information with its broker, Corporate Realty, which led to the poaching of Stewart's tenants and lost profits.[124] Ultimately, Stewart contends that 111 Veterans' actions caused Stewart to incur (1) unnecessary insurance costs (over $1 million a year);[125] (2) lost profits;[126] (3) lost business value;[127] and (4) attorney's fees.[128]

In opposition, 111 Veterans argues that its actions constituted behavior typical of business competitors, not LUTPA violations.[129] 111 Veterans contends that its

---

[121] *Id.* at 23 ¶ 75.

[122] *Id.*

[123] *Id.*

[124] ECF No. 41-3 at 272; ECF No. 41-1 at 19–25. This argument was not raised in Stewart's complaint, but was alleged in its motion for summary judgment.

[125] *Id.* at 25.

[126] Stewart alleges that 111 Veterans attempted to steal two of its tenants. One tenant moved to a Feil-owned building, and a second tenant was about to move buildings before forcing Stewart to lower its rent price in April 2024. Stewart claims that both instances have resulted in lost profits. *Id.* at 25. Stewart notes that information on these tenants was included in the confidential rent rolls sent to Corporate Realty in May 2022. *Id.* It claims that Corporate Realty then targeted these tenants for the next two years. *Id.*

[127] Stewart alleges that 111 Veterans' scheme has caused potential buyers to lose interest in the building because no potential buyer will want to do business with a ground lessor who acts in bad faith. *Id.*

[128] Stewart seeks attorney's fees and expenses incurred since May 2022. *Id.*

[129] ECF No. 45 at 22–24.

behavior, and the behavior of Feil, was typical of long-standing business competitors in a small market.[130] According to 111 Veterans, Stewart's allegations of a scheme to take over Heritage Plaza are unfounded; this suit is merely Stewart's attempt "to turn the four decades of competition among Metairie's class A buildings into a cause of action."[131] As to the confidential tenant information 111 Veterans disclosed to Corporate Realty,[132] 111 Veterans claims Corporate Realty already possessed similar information and thus did not rely on or need Stewart's rent rolls.[133] And 111 Veterans contends that the lack of potential buyers for Heritage Plaza had nothing to do with any of 111 Veterans' actions.[134]

LUTPA prohibits the use of "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." LA. STAT. ANN. § 51:1405(A). "[T]he elements of a cause of action under LUTPA are: (1) an unfair or deceptive trade practice declared unlawful; (2) that impacts a consumer, business competitor or other person to whom the statute grants a private right of action; (3) which has caused ascertainable loss." *Flood v. Uber Techs., Inc.*, No. CV 18-4322, 2018 WL 3387536, at *4 (E.D. La. July 12, 2018) (quoting *Who Dat Yat LLC v. Who Dat?*

---

[130] *Id.*

[131] *Id.* at 22.

[132] ECF No. 41-3 at 272, 275, 281.

[133] ECF No. 45 at 23. Bruce Sossaman, Corporate Realty's Leasing Director, explained that he maintained his "own database" on tenants, including those leasing space within Heritage Plaza. ECF No. 45-4 at 6.

[134] "[Stewart] sent out an e-mail blast on January 10, 2023 to over 4,000 possible buyers . . . [o]ther than 111 Veterans, not a single prospective purchaser other than Feil expressed more than a passing interest." ECF No. 45 at 8.

*LLC*, No. 10-1333, 2011 WL 39043, at *3 (E.D. La. Jan. 4, 2011).[135] LUTPA does not specifically define an "unfair trade practice." Instead, [i]t has been left to the courts to decide, on a case-by-case basis, what conduct falls within the statute's prohibition." *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 35 So. 3d 1053, 1059 (La. 2010). "The range of prohibited practices under LUTPA is extremely narrow and includes only egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct.*" IberiaBank v. Broussard*, 907 F.3d 826, 839–40 (5th Cir. 2018) (internal quotations omitted). And the "defendant's motivation" is a critical factor—his "actions must have been taken with the specific purpose of harming the competition." *Id.*

Considering the summary-judgment record, the Court finds the existence of genuine disputes of material fact to preclude summary judgment on the LUTPA claim. For instance, LUTPA requires proof that the alleged unfair or deceptive conduct caused an ascertainable loss. But it is unclear from the record what loss Stewart suffered and whether 111 Veterans' caused such loss through unfair or deceptive trade practice. In viewing the evidence in the light most favorable to 111 Veterans, Stewart's lost profits are not entirely ascertainable. Moreover, there is still an open question as to whether Stewart's inability to sell Heritage Plaza was a result

---

[135] "Business consumers and competitors are included in the group afforded a private right of action under [] LUTPA." *Flood*, 2018 WL 3387536, at *4 (E.D. La. July 12, 2018) (internal quotations omitted). It is undisputed that Stewart and 111 Veterans are competitors in the Metairie office market.

of 111 Veterans' conduct, the volatility of the commercial office market, or some other reason.[136]

Additionally, while Stewart claims 111 Veterans sought to take advantage of Stewart's confidential tenant information, 111 Veterans claims its leasing agent already possessed information on Heritage Plaza tenants, rental rates, and lease expirations.[137] While 111 Veterans acknowledges it competed with Stewart for tenants, 111 Veterans contends it simply "behaved as any [] rival would."[138] And although 111 Veterans shared the information with Corporate Realty in violation of the confidentiality agreement,[139] it is unclear whether 111 Veterans actually misused any confidential information to poach tenants, and if so what loss Stewart suffered as a result. As such, the Court finds that summary judgment is not proper on Stewart's LUTPA claims.

### E. 111 Veterans' Claims for Declaratory Judgment

Finally, 111 Veterans seeks partial summary judgment on its contrary interpretation of Section 3(g).[140] 111 Veterans asks the Court to (1) declare that Stewart's obligation to maintain non-flood property insurance under Section 3(g) is *not* limited by what is "reasonably obtainable;" and to (2) dismiss all claims for relief

---

[136] According to Evan Stone, the real estate broker marketing Heritage Plaza, buildings of "this vintage don't normally trade in the [$40 million range] even in the best of times." ECF No. 45-20 at 1. He also notes that the price was aggressive given current economic volatility, the reduction in office market investors, and the building's ground lease. *Id.*

[137] ECF No. 45 at 23.

[138] *Id.* at 24.

[139] This was admitted by 111 Veterans during the oral argument on these motions on October 4, 2024.

[140] ECF No. 43.

by Stewart based upon a contrary reading of Section 3(g).[141] But as described above, the Court has determined that "if reasonably obtainable" places a condition on coverage requirements for both flood and non-flood insurance. And because the Court finds that 111 Veterans' interpretation of Section 3(g) is incorrect, 111 Veterans' cross motion for partial summary judgment necessarily fails.

---

[141] *Id.* at 1.

## IV.    CONCLUSION

Accordingly, for the reasons discussed above,

**IT IS ORDERED** that the motion[142] for summary judgment by Plaintiff Stewart Development, LLC is **DENIED**.

**IT IS FURTHER ORDERED** that the motion[143] for partial summary judgment by Defendant 111 Veterans Boulevard, LLC is **DENIED.**

**IT IS FURTHER ORDERED** that the phrase "if reasonably obtainable" in Section 3(g) of the Fourth Amendment of the Ground Lease applies a condition upon Stewart's flood and non-flood insurance obligations**.**

New Orleans, Louisiana, this 15th day of November, 2024.

BRANDON S. LONG
UNITED STATES DISTRICT JUDGE

---

[142] ECF No. 41.
[143] ECF No. 43.