**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **STEWART DEVELOPMENT, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-2085** |
| **111 VETERANS BOULEVARD, LLC** | **SECTION "O"** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    INTRODUCTION

This action stems from a dispute over the insurance provision of a ground lease between Plaintiff Stewart Development, LLC ("Stewart") and Defendant 111 Veterans Boulevard, LLC ("111 Veterans").[1] Stewart owns Heritage Plaza (the "Building"), an office tower in Metairie, Louisiana, but leases the land on which it sits from 111 Veterans. In 2023, 111 Veterans sent a default letter to Stewart alleging that Stewart was in violation of the ground lease by failing to maintain insurance coverage and insurance deductibles in amounts required by the lease.

The Court conducted a five-day bench trial on Stewart's claims against 111 Veterans for breach of contract in bad faith and violations of the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA").[2] In connection with these claims, Stewart seeks damages and declaratory judgments against 111 Veterans. The Court also tried 111 Veterans' counterclaim requesting declaratory judgments that Stewart breached its obligations in the ground lessee.

---

[1] ECF No. 1.
[2] ECF Nos. 85–89.

1

At the conclusion of the five-day bench trial, the Court ordered the parties to submit additional briefing and responses.[3] Now, having carefully considered the testimony of all witnesses, the exhibits admitted into evidence during trial, the applicable law, and the arguments by the parties, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court is prepared to rule as follows.[4]

## II.    FINDINGS OF FACT

### A.    Background

1.      Plaintiff Stewart Development, LLC built and owns the Class A commercial office building known as Heritage Plaza located at 111 Veterans Memorial Blvd, Metairie, Louisiana 70005. The building was completed in the early 1980's.[5] Heritage Plaza is the sole asset of Stewart Development, LLC. [6] Stewart Development, LLC, through intermediary entities, is owned by Frank Stewart, who funds the LLC's operations.[7]

2.      The only other Class A commercial office buildings in Metairie, besides Heritage Plaza, are Galleria and the three-building complex known as Lakeway Center. Galleria and Lakeway Center were also completed in the 1980's and have competed with Heritage Plaza for tenants since their completion.[8]

---

[3] ECF Nos. 97, 98, 99, 100.

[4] To the extent any of the Court's findings of fact are more properly characterized as conclusions of law, the Court adopts those findings as conclusions of law, and to the extent any conclusions of law constitute findings of fact, the Court adopts those conclusions as findings of fact.

[5] ECF No. 73, Uncontested Material Facts, at 7(1); Testimony of Mohamad Motahari.

[6] Testimony of Mohamad Motahari.

[7] *Id.*

[8] ECF No. 73 at 7(5); Testimony of Colette Wharton; Stewart Trial Exhibit ("Stewart Ex.") 443. Heritage Plaza has a total of approximately 350,000 square feet of office space. Testimony of Mary

3.      Plaintiff Stewart Development, LLC ("Stewart") leases space in Heritage Plaza to a variety of tenants including law firms, medical practices, and a restaurant.[9]

4.      Stewart does not own the land on which Heritage Plaza sits. Since 1980, Stewart has leased that land pursuant to a ground lease.[10]

5.      In 2003, Stewart obtained a commercial loan backed by the Building.[11] As a condition of the loan, the lender required Stewart and then-landowner/lessor, a Trust created under the Will of Margaret E. Lauer, to amend the existing ground lease to include a provision requiring Stewart to maintain certain insurance coverage on the Building.[12] This was the fourth such amendment to the ground lease, referenced herein as "Section 3(g) of the Fourth Amendment of the Ground Lease" or simply "Section 3(g)."

6.      Stewart and the lender were named loss payees who would receive the insurance proceeds in the event a claim was paid out. Because the ground lessor had no ownership interest in the Building itself, the lessor would receive no insurance proceeds in the event of a Building loss.[13]

7.      On November 2, 2017, 111 Veterans purchased the land under Heritage Plaza.[14]

---

Beth Verdigets. The Galleria's square footage is just under 500,000 square feet, and the three Lakeway buildings have approximately 1.2 million square feet. Testimony of Colette Wharton.

[9] Testimony of Mary Beth Verdigets.
[10] ECF No. 73 at 7(2); Testimony of Mohamad Motahari.
[11] ECF No. 73 at 7(7).
[12] Testimony of Mohamad Motahari; Stewart Ex. 2.
[13] *Id.*
[14] ECF No. 73 at 7(3).

8.    111 Veterans is one of a set of affiliated companies that operate under the trade name of The Feil Organization.[15] Jeffrey Feil is the ultimate decision maker for companies within The Feil Organization.

9.    Companies within The Feil Organization acquired Galleria on February 1, 2005, and all of Lakeway Center, except for a hotel unit in Lakeway III, on June 11, 2013. The Feil Organization continues to own these buildings.[16] As the owner of the only other Class A commercial office buildings in Metairie, The Feil Organization is a direct competitor of Stewart.[17]

10.    Upon acquiring the land under Heritage Plaza in 2017, 111 Veterans executed an Assignment and Assumption of the Heritage Plaza ground lease.[18] Through this assignment, 111 Veterans became Heritage Plaza's ground lessor.

11.    As the ground lessor, 111 Veterans owns the ground but has no ownership interest in the Building itself.[19]

12.    Section 3(g) of the Fourth Amendment of the Ground Lease binds 111 Veterans and Stewart as lessor and lessee.[20] That section reads:

> Whichever party is required to maintain fire insurance on the improvements on the Demised Premises shall keep same insured with financially sound and reputable insurance companies against loss or damage by fire, theft, lightning, windstorm, hail, explosion, riot and civil commotion, aircraft and vehicles, and smoke and such other casualties as are presently included in the so-called Extended Coverage

---

[15] ECF No. 73 at 7(4). Colette Wharton testified that the Feil Organization is "a $7 billion real estate group that owns and manages a large portfolio in New York, Louisiana, Florida, Illinois, and a few hundred ground leases throughout the United States." The Feil Organization is a "fictitious name where each – where each of the properties stands on its own entity." Testimony of Colette Wharton.

[16] ECF No. 73 at 7(6).

[17] ECF No. 73 at 7(5).

[18] ECF No. 73 at 7(10); Testimony of Eric Lowenstein; Stewart Ex. 22.

[19] ECF No. 73 at 7(9); Testimony of Eric Lowenstein.

[20] Stewart Ex. 2.

4

Endorsement; and flood, if reasonably obtainable, in amounts sufficient to prevent the insured from becoming a co-insurer within the terms of the insurance policies covering such risks, but in any event in an amount not less than 100% of the actual replacement cost of such improvements (exclusive of excavation and foundation costs and costs of underground tanks, conduits, pipes, pilings and other similar underground items), less the actual physical depreciation thereof, and with not more than a $10,000 deductible from the loss payable for any particular occurrence.

13.    Interpreting this Section, Stewart was required to maintain insurance coverage limits up to its actual replacement cost (exclusive of certain delineated costs), less actual physical depreciation,[21] and maintain deductibles of not more than $10,000.

14.    This requirement was subject to a condition—Stewart was required to secure coverage at replacement cost for the itemized casualties only if such coverage was "reasonably obtainable."

15.    In ruling on the parties' motions for summary judgment under FED. R. CIV. P. 56,[22] the Court determined that the phrase "if reasonably obtainable" in Section 3(g) modifies all types of casualties listed in Section 3(g)—including "fire, theft, lightning, windstorm, hail, explosion, riot and civil commotion, aircraft and vehicles, and smoke"—and is not limited to modification of "flood." Put another way, Section 3(g) obligates Stewart to maintain insurance "against loss or damage by fire, theft, lightning, windstorm, hail, explosion, riot and civil commotion, aircraft and vehicles, and smoke and such other casualties[,] and flood" in an amount not less than

---

[21] Replacement cost is "the cost to repair or replace property with like, kind, and quality without deductible for depreciation." Testimony of Anderson Baker.
[22] ECF No. 83.

100% of replacement cost, less physical depreciation, only if such insurance is "reasonably obtainable." This fact was treated as established in the case.[23]

16.    The ground lease does not define the term "reasonably obtainable."[24]

17.    The casualties for which Stewart is required to maintain insurance coverage under Section 3(g) include wind and flood, as well as a range of other casualties colloquially known as "all other perils" or "AOP" (*e.g.*, fire, theft, lightning, explosion, etc.).[25]

18.    As the ground lessor, 111 Veterans is not entitled to any insurance proceeds under Section 3(g).[26]

19.    Section 30 of the ground lease governs "Events of Default."[27] Under that section, the "Lessor [111 Veterans] may, if lessor so elects, and with or without any demand or notice whatsoever, except as hereinafter expressly provided, terminate this lease upon the happening, occurrence, or existence of any one or more of the following Events of Default[.]" Section 30(b) then lists as an "Event of Default" the

---

[23] ECF No. 83 at 1.

[24] Stewart Ex. 2.

[25] In trial testimony, Andrew Schutzman, Feil's insurance consultant, described all-other-perils coverage as follows:

> So when we talk about all other perils, you know, most policies are written on what we call a special form which covers all perils except what's specifically excluded. And so, there is a huge -- you know, there is a long listing of perils that can damage property, and they fall under all other perils. Catastrophic perils most of the time are excluded. That would include -- flood and earthquake is a standard exclusion, and windstorm and named windstorms in exclusion in areas that are subject to a high degree of exposure to windstorm.

> So, for Louisiana, when you talk about all other perils, you're talking about all these other perils -- fires, malicious mischief damage, cars crashing into the building, anything you could pretty much think of that's not excluded; but, it would not cover catastrophic perils such as windstorm, flood, and earthquake, even though it's not applicable in Louisiana.

[26] Testimony of Mohamad Motahari; Testimony of Arthur Sterbcow; Stewart Ex. 198.

[27] Stewart Ex. 2.

6

"Failure of Lessee [Stewart] to promptly and fully perform or comply with any agreement, promise, covenant, or provision of this lease to be performed or complied with by Lessee . . . ."

20.    Section 30 goes on: an "Event of Default shall be considered to exist for all purposes of this lease, immediately upon its happening, occurrence or existence whether or not it continues unremedied or uncured for such period of time that . . . Lessor has the election to terminate this lease."[28]

21.    Section 30 further states:[29]

Lessor's right to elect to terminate this lease for any other Event of Default shall not accrue until after 60 days following written notice by Lessor to Lessee specifying the instance or instances of default followed by Lessee's failure to cure each specified Event of Default or to take such steps as may be necessary to avert the effect of any such default[.] . . . Where, by the terms of this Section, notice is required and the default as specifically set forth in said notice, shall not be cured within the time set forth in such notice, and as provided in this Section, this lease and all Lessee's rights and interests under it shall terminate and be at an end[.]

22.    Highlighting and summarizing the pertinent provisions of Section 30: (1) it is considered an event of default if Stewart fails to comply with any provision of the lease, including Section 3(g) of the Fourth Amendment of the Ground Lease; (2) an event of default exists at the time the event happens, not at the time 111 Veterans issues notice of default; and (3) after receiving notice, Stewart has a 60-day cure period to remedy the default before 111 Veterans can terminate the lease.

---

[28] *Id.*
[29] *Id.*

**B.      Stewart's Insurance Coverage on Heritage Plaza**

23.      A 2013 appraisal of Heritage Plaza determined that the building had a market value of $40.7 million.[30]

24.      On or around April 1, 2013, Stewart's insurance broker ran a report calculating the "Insurable Value (Replacement Cost)" of Heritage Plaza, minus certain exclusions, to be $49,836,778.[31]

25.      Stewart requested permission from its lender to insure the Building at its appraised value of $40 million, even though its replacement cost was higher at $49,836,778.[32] On or around April 1, 2013, Stewart's lender agreed to accept $40 million of insurance coverage, even though that amount was less than the replacement cost (minus depreciation) of the Building.

26.      The ground lessor/landowner in 2013 (who preceded 111 Veterans) knew the Building was insured for less than replacement cost with deductibles over $10,000 and never objected.[33]

27.      From 2013 until 2021, Stewart continued to maintain roughly $40 million of insurance coverage and deductibles over $10,000 each year, including after 111 Veterans purchased the land under Heritage Plaza and assumed the lease in 2017.[34]

---

[30] ECF No. 73 at 7(8); Testimony of Mohamad Motahari.
[31] Testimony of Mohamad Motahari; Stewart Ex. 134.
[32] Testimony of Mohamad Motahari; Stewart Ex. 134.
[33] Testimony of Mohamad Motahari.
[34] Testimony of Eric Lowenstein; Stewart Exs. 24–31.

28.     At the time it sold the land and turned over the lease to 111 Veterans,[35] the prior landowner/lessor certified that Stewart was in compliance with the lease. 111 Veterans accepted this certification.[36]

29.     Each subsequent year, 111 Veterans received from Stewart a record of the Building's insurance coverage—called a certificate of insurance—showing Stewart's coverage amounts.[37]

30.     On February 22, 2018, Jason Provenzano at HUB International, 111 Veterans' insurance broker, ran a CoreLogic valuation report which estimated the replacement cost of the Building to be $80,187,954.[38] Provenzano assumed, but could not say for sure whether, this report was provided to The Feil Organization. 111 Veterans claims it has no record of receiving the report in 2018. Stewart maintained $40,000,000 in total loss insurance coverage on the Building in 2018.

31.     In 2021, Stewart's insurance broker Arthur J. Gallagher Risk Management, Inc. ("Gallagher") used a CoreLogic report to determine the replacement cost of the Building to be $62,952,212.[39] In 2021, Stewart obtained insurance with total loss coverage limits in the amount of $62,952,212.[40]

32.     In 2022, Anderson Baker, an insurance agent with Gallagher who represented Stewart, ran a CoreLogic report to determine the replacement cost of the

---

[35] Stewart Ex. 22.
[36] Testimony of Eric Lowenstein.
[37] ECF No. 73 at 7(13); Testimony of Colette Wharton; Stewart Ex.s 29–33.
[38] ECF No. 73 at 7(11); Stewart Ex. 6; Stewart Ex. 5, Deposition Testimony of Jason Provenzano.
[39] Testimony of Anderson Baker; Stewart Ex. 154.
[40] Stewart Ex. 32.

9

Building.[41] According to the February 8, 2022 report, the replacement value had increased to $106,226,647.[42] Based on this figure, Gallagher estimated that the replacement cost of the Building, after deduction for the foundation, was $93,256,654 (not including personal property and business income).[43]

33.    On April 5, 2022, Baker transmitted this report to Mohamad Motahari, Stewart's CEO.[44]

34.    On May 29, 2022, Stewart renewed its insurance policy on the Building. The policy included a total loss limit of $40,000,000 rather than the replacement cost (minus depreciation) of $93,256,694.[45] The wind/hail deductible was $100,000, and the named storm deductible was 7.5% with a $100,000 minimum.

35.    At trial, Anderson Baker testified that AmWINS, the surplus lines insurance broker used by Baker, had been unwilling to offer a policy for all perils with total loss limits of $93,256,694 in 2022.[46] Baker testified that he did not remember shopping around for another underwriter who might be willing to provide additional coverage, nor did he consider adding a layer of AOP-specific coverage above the $40 million loss limit.

36.    At the time Baker had been unaware of Section 3(g) of the Fourth Amendment of the Ground Lease, and thus was unaware of Stewart's obligation to

---

[41] Testimony of Anderson Baker; 111 Veterans Trial Exhibit (111 Vets Ex.) 23.
[42] *Id.*
[43] Testimony of Anderson Baker; Stewart Ex. 391.
[44] 111 Vets Ex. 23.
[45] Testimony of Anderson Baker; Stewart Ex. 33.
[46] Testimony of Anderson Baker.

carry insurance coverage for certain, delineated categories of casualty up to replacement cost if reasonably obtainable.[47]

37.    On March 16, 2023, 111 Veterans sent Stewart a default letter stating that Stewart was in breach of Section 3(g).[48] The default letter reads in relevant part:

> The purpose of this notice is to inform you that Tenant [Stewart] is currently in violation of the Lease in two respects:
>
> 1.  Pursuant to Section 3(g) of the Fourth Amendment of Ground Lease dated April 10, 2003 (the "Fourth Amendment"), Tenant is required to maintain property insurance in "an amount not less than 100% of the actual replacement cost of [the] improvements (exclusive of excavation and foundation costs and costs of underground tanks, conduits, pipes, pilings and other similar underground items), less the actual physical depreciation thereof. . ."
>
> According to the Certificate of Insurance most recently made available by Tenant to Landlord [111 Veterans], the existing property insurance carried by Tenant is in the amount of $40,000,000.00, which figure also includes personal property and loss of income coverages. The personal property amount of $250,000.00 and the loss of income amount is $8,535,535.00, which yields coverage for the improvements themselves in the amount of $31,214,465.00.
>
> Landlord's insurance consultant and its advisors fix the replacement cost of the improvements at $123,000,000.00. Tenant is obligated, under Section 23 and other provisions of the Lease, to keep the improvements in good condition. Therefore, actual physical depreciation should be minimal. Allowing for an actual physical depreciation factor of 10% due to wear and tear of various components of the improvements, property insurance in the amount of $110,700,000.00 would be required. Thus, the amount of property insurance currently being carried by Tenant is deficient under the Lease by any reasonable measure, and Tenant is therefore in violation of the Lease.
>
> 2. The same provision of the Lease requires that the property insurance be maintained with a deductible of no more than $10,000.00. Again, according to the available Certificate of Insurance, this deductible is not met for wind/hail coverage (for which the deductible is $100,000.00) or

---

[47] *Id.*

[48] ECF No. 73 at 7(21); Stewart Ex. 63.

for named storm wind/hail coverage (for which the deductible is 7.5% of the total insurable value). Again, Tenant is in violation of the Lease's requirements regarding the maximum possible deductible under the property insurance.

Please consider this letter as Landlord's written notice to Tenant of default on the part of Tenant under the Lease in the respects set forth above. As required under the Fourth Amendment, we are sending a copy of this letter to each leasehold mortgagee of record. Landlord reserves the right to exercise all of its available rights and remedies under the Lease, including without limitation termination of the Lease, if the defaults are not cured within the applicable time periods under the Lease.

38.    At the time of the March 16, 2023 notice, Stewart maintained total loss coverage of $40 million—which was less than the Building's replacement cost minus depreciation—and maintained a $100,000 deductible for wind and named storm.[49]

39.    At no point from its 2017 acquisition of the land until March 16, 2023, had 111 Veterans ever formally objected to Stewart's insurance coverage on the Building.[50]

40.    After receiving the default notice in March 2023, Stewart contacted Anderson Baker at Gallagher to assess how to comply with 111 Veterans' demand.[51] Baker in turn contacted AmWINS and Risk Place Services, underwriting companies that survey the world-wide market for available insurance. Neither AmWINS nor Risk Place Service would provide a quote for all-perils coverage at replacement cost.[52]

---

[49] Stewart Ex. 33.
[50] ECF No. 73 at 7(14). Testimony of Mohamad Motahari.
[51] Testimony of Mohamad Motahari.
[52] Testimony of Mohamad Motahari; Testimony of Anderson Baker.

Baker testified at trial that $110 million of full coverage for all perils on Heritage Plaza with a $10,000 deductible was "not available, period," in the market.[53]

41.     Significantly, when tasking Baker to find coverage that would address 111 Veterans' alleged default, Stewart had asked Baker to identify *all perils* coverage up to replacement cost.[54] Baker did not attempt to secure *AOP-specific* coverage up to replacement cost.[55] After his search, Baker informed Stewart that total all-perils coverage was not available up to replacement cost.[56]

42.     Based on this feedback from Baker, Stewart sent a response letter to 111 Veterans on March 31, 2023 detailing the impacts of hurricanes on the market and reasons why the demanded coverage was not "reasonably obtainable."[57]

43.     Upon receiving Stewart's response, 111 Veterans sent a supplemental default notice that highlighted Stewart's alleged deficient windstorm coverage and deductibles: "[F]or the most serious threat of major casualty loss that Heritage Plaza faces, damage from a serious wind storm, the building has only $10,000,000 of third-party insurance, and even that coverage is only reached after a deductible nearly that large is first satisfied."[58] 111 Veterans did not demand standalone AOP coverage in this supplement.

---

[53] Testimony of Anderson Baker.
[54] Testimony of Mohamad Motahari; Testimony of Anderson Baker.
[55] Testimony of Mohamad Motahari; Testimony of Anderson Baker.
[56] Testimony of Mohamad Motahari; Testimony of Anderson Baker.
[57] Stewart Ex. 67.
[58] Stewart Ex. 77.

## C.    The Reasonable Obtainability of AOP Coverage

44.    In the aftermath of Hurricane Ida in 2021, insurance rates were increasing.[59]

45.    In 2023, full replacement cost coverage on wind and flood risks in South Louisiana came at a "very exorbitant cost,"[60] if it was available at all. AOP coverage, however, remained largely unchanged after Hurricane Ida in 2021.[61]

46.    The availability of insurance in the market was entirely dependent on what underwriters were willing to offer.[62] Commercial insureds, like Stewart and 111 Veterans, "rely exclusively" on professional brokers to find available coverage.[63] Underwriters may refuse to provide coverage entirely or may limit what coverage they are willing to offer. It is the responsibility of a broker (like Andersen Baker at Gallagher) to contact carriers and distributors, find available coverage, and relay those options to an insured.[64]

47.    Importantly, Baker's 2023 inquiries with AmWINS and Risk Place Service were focused on securing total insurance coverage for all casualties, including wind and flood. Baker did not seek quotes for all-other-perils coverage or inquire whether AOP-specific coverage was available up to Heritage Plaza's replacement cost.[65]

---

[59] Testimony of Timothy Gold.
[60] Testimony of Andrew Schutzman.
[61] *Id*.
[62] Testimony of Eric Lowenstein.
[63] Testimony of Mohamad Motahari.
[64] Testimony of Eric Lowenstein; Testimony of Mohamad Motahari.
[65] Testimony of Anderson Baker.

48.    In its post-trial briefing, Stewart acknowledges that "it is routine for a broker to request full coverage and for an underwriter to offer AOP coverage only."[66]

49.    The Court heard from several witnesses about the availability and cost of non-wind, non-flood insurance coverage (*i.e.*, AOP coverage)[67] between 2022 and 2024. Those witnesses included Eric Lowenstein, Feil's Chief Financial Officer; Andrew Schutzman, The Feil Organization's insurance consultant; Timothy Gold, 111 Veterans' insurance brokerage expert; and Anderson Baker, Stewart's insurance broker.

### 1.    Eric Lowenstein, Feil's Chief Financial Officer

50.    Lowenstein testified that the Feil Organization has no internal employee solely responsible for deciding insurance issues, but that Lowenstein works with an outside group (Andrew Schutzman at AMS) to review pricing and availability of insurance for Feil properties.[68]

51.    Responding to a question at trial about the availability of insurance in the spring of 2023, Lowenstein testified that AOP coverage at replacement cost limits for Heritage Plaza was both available and cheap: "I think it was very clear that for AOP coverage, it was available and very cheap; so for wind, it was available but expensive. Okay. But for AOP coverage for the full replacement cost, it was there, it was available, and very, very cheap."[69]

---

[66] ECF No. 98 at 9; Testimony of Eric Lowenstein.
[67]  Testimony of Anderson Baker. Baker testified that "when you have AOP coverage . . . wind is separate."
[68] Testimony of Eric Lowenstein.
[69] *Id.*

52.    Lowenstein testified that Feil obtained AOP insurance coverage for the Lakeway III building up to full replacement cost of approximately $122 million for approximately $159,000.[70] That same insurer was unwilling to write a wind policy for Lakeway III. According to Lowenstein, "you can go to the market and say, don't give us wind insurance; just give us AOP coverage. You're able to restrict what you're bidding out."

53.    In the time that Lowenstein has worked for Feil, he has never had a property with AOP coverage at less than full replacement cost.[71]

### 2.    Andrew Schutzman, Feil's Insurance Consultant

54.    Schutzman, an insurance consultant who assisted Feil in putting together insurance programs for over twenty years, testified that named storm and wind coverage up to replacement cost were exorbitantly expensive.[72] But Schutzman never encountered difficulty in obtaining AOP coverage for Feil's Louisiana properties for their total insured value ("TIV")—a combination of the value of real property, personal property, and lost business income—at a commercially reasonable rate. While Hurricane Ida caused a sharp increase in the cost of wind coverage in southeast Louisiana, Schutzman testified that Ida did not have significant effect on the cost of AOP coverage because the storm did not change the carriers' AOP

---

[70] *Id.*
[71] *Id.*
[72] Testimony of Andrew Schutzman.

exposure.[73] Damage from a hurricane, including flood and wind damage, does not impact the likelihood of future exposure from non-hurricane perils.[74]

55.  Bolstering Schutzman's point was testimony about the Lakeway buildings, which are owned by Feil and were insured separately from Feil's other properties in southeastern Louisiana. Schutzman testified that full limits AOP coverage for the 2023-24 period for Lakeway III, a large commercial condominium building, cost $159,930 for a TIV of just over $134 million.[75] Schutzman extrapolated that the cost of AOP coverage up to Lakeway III's TIV for 2021-2022 and 2022-2023 was similar.

56.  Moreover, for Lakeway I and Lakeway II, two adjacent buildings with a combined TIV in excess of $200 million, Feil had no difficulty obtaining full limits AOP coverage from 2020 forward.[76]

57.  Schuztman testified, based on his experience, that it was "reasonable" to "weigh[] the coverage that you're buying versus the cost."[77] Schutzman concluded that full limits AOP coverage was reasonably obtainable and available at a commercially reasonable price for the Feil buildings.

### 3. *Timothy Gold, 111 Veterans' Insurance Brokerage Expert*

58.  Timothy Gold, an experienced New Orleans insurance professional, testified as a defense expert in the placement of insurance coverage on commercial

---

[73] *Id.* Anderson Baker agreed that the primary driver of increases in premiums in 2022 and later was coverage for wind exposure. Testimony of Anderson Baker.

[74] Testimony of Andrew Schutzman.

[75] *Id.*; 111 Vets Ex. 93; 111 Vets Ex. 96.

[76] Testimony of Andrew Schutzman. *But see* Stewart Ex. 162 (insuring Lakeway I and II up to replacement cost in 2022/2023, but not in 2023/2024).

[77] Testimony of Andrew Schutzman.

property.[78] Gold explained that during the period from 2022 to 2024, insurance rates were going up, driven by the cost of wind coverage, but AOP coverage was increasing only at a pace consistent with inflation. Gold had placed coverage for thousands of properties and rarely had any difficulty placing separate AOP coverage on commercial properties in the New Orleans area at TIV limits at a reasonable price.[79] Gold "firmly believe[d]" full limits AOP coverage could have been obtained for Heritage Plaza at a reasonable price. According to Gold, "It was very, very unusual that you couldn't place a property policy that excludes wind [*i.e.*, AOP coverage] to full—to the full limits you were requesting."[80] Based on his own experience placing AOP coverage up to full limits "[t]housands" of times,[81] and confirmed by his conversations with three experienced surplus line brokers, Gold had "full confidence" that it would have been possible to purchase AOP coverage at a reasonable price in 2022 and 2023 for the total insured value of Heritage Plaza.

### 4.   *Anderson Baker, Stewart's Insurance Broker*

59.   In 2022 and 2023, Stewart relied exclusively on Baker's team at Gallagher to find available insurance.[82]

60.   Baker testified that, when he was searching for insurance coverage for Stewart, no underwriter offered him AOP coverage and he does not believe it would have been available at a commercially reasonable price.[83]

---

[78] Testimony of Timothy Gold.

[79] *Id.*

[80] *Id.*

[81] Timothy Gold acknowledged that he has not placed coverage in a Class A high rise office building like Heritage Plaza. Testimony of Timothy Gold.

[82] Testimony of Mohamad Motahari.

[83] Testimony of Anderson Baker.

61. Baker testified that AmWINS was unwilling to underwrite a policy with coverage up to replacement cost in 2022.[84] Motahari, Stewart's CEO, while not happy with the cost of the 2022 renewal policy from AmWINS, was satisfied to have $40 million of total coverage and was not interested in seeking higher AOP limits.

62. The most amount of damage Heritage Plaza had ever sustained was approximately $16 million in damages caused by Hurricane Katrina.[85] The largest AOP loss the building had ever sustained was approximately $100,000.

63. Baker adhered to Motahari's wishes in 2022 and made no effort to find a layer of AOP coverage above the $40 million limit.[86]

64. Baker testified that, despite Baker's brokerage firm having worked for Heritage Plaza since approximately 2007, he was unaware of Section 3(g) of the Fourth Amendment of the Ground Lease and thus unaware of Stewart's obligation to carry insurance coverage for certain, delineated categories of casualty up to replacement cost if reasonably obtainable. Baker learned of Section 3(g)'s insurance obligation only upon receiving a copy of the March 16, 2023 default letter—after having placed only $40 million of total loss coverage on Heritage Plaza during the 2022 renewal cycle.[87]

65. Baker conceded that, after receiving the default letter, he did not ask underwriters to quote AOP-specific coverage. Baker testified that, in 2023, he "never

---

[84] *Id.*
[85] Testimony of Mohamad Motahari.
[86] Testimony of Anderson Baker.
[87] *Id.*

had the discussion [with Stewart] to get AOP only" and "was not instructed to ask the question."[88]

66.     Baker speculated that if he had sought additional AOP coverage in 2022 or 2023 to reach Heritage Plaza's total insured value, he would have been unsuccessful.[89] He further speculated that, if requested by his client, he "could have gotten AOP standalone using a layered approach, but it would have been exorbitant."[90] When asked to guess how much it would have cost to layer AOP coverage up to replacement cost, Baker said he "d[id] not know," and when asked again, he guessed: "in the range of another $200,000" but he "d[id] not know" because he was "never asked" by Stewart to find such coverage and had not asked insurance companies to quote AOP-only coverage.

67.     Baker also testified that any comparison of coverages between Heritage Plaza and Lakeway I and II were inapt, because those two buildings were insured together, and a program that insures risks across more than one building will achieve coverages that a single building like Heritage Plaza cannot.[91] Baker further testified that any comparison between Heritage Plaza and Lakeway III was similarly inappropriate, because Lakeway III's coverage only included the building's outer shell, whereas Heritage Plaza's coverage included the interiors of the building, such as interior walls, fixtures, carpeting, and the like.[92]

---

[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] *Id.*

68.    During trial, Baker was shown charts reflecting Lakeway III's shared and layered insurance program each year between 2020 and 2024.[93] A shared program is one in which multiple insurance carriers share the risk of coverage up to certain loss levels; a layered program involves increasing "layers" of desired coverage, with each layer costing an additional premium.[94] According to the charts, for Lakeway III, for each annual renewal period between 2020 and 2023, Feil paid premiums between $65,000 and $71,500 to obtain "layered" AOP coverage that increased Lakeway III's loss limit from $50 million to its TIV of $127,569,795.[95] In the 2023-2024 renewal cycle, Feil paid $156,794 to increase Lakeway III's AOP coverage from $30 million to its TIV of $134,040,047.[96]

69.    In his trial testimony, Baker acknowledged that these additional premiums were a reasonable cost for the amount of additional AOP coverage Lakeway III obtained.[97]

**D.    In an Attempt to Avoid Default, Stewart Obtains a Captive Cell Policy**

70.    After Stewart received the March 2023 default letter and Baker was unable to secure higher coverage from AmWINS and Risk Place Services, Baker's attention turned to finding a captive cell policy.[98]

71.    Section 3(g) of the Ground Lease requires that Stewart "keep [Heritage Plaza] insured with financially sound and reputable insurance companies."[99] The

---

[93] *Id.*; 111 Vets Ex. 96.
[94] Testimony of Anderson Baker; Testimony of Andrew Schutzman.
[95] Testimony of Anderson Baker; 111 Vets Ex. 96.
[96] Testimony of Anderson Baker; 111 Vets Ex. 96.
[97] Testimony of Anderson Baker.
[98] ECF No. 73 at 7(22); Testimony of Anderson Baker.
[99] Stewart Ex. 2.

Ground Lease does not define a "financially sound and reputable insurance compan[y]."

72.    Hartwell Insurance Company is a "protected cell captive insurance company" organized under Tennessee law.[100] It administers a set of "protected cells," which function as separate captive insurers pursuant to participant contracts. Tenn. Code Ann. § 56-13-202(2), (4)(6). The protected cells operate independently: "The cells are walled off from each other via contract, so no one shares cash, no one shares liabilities. [E]ach cell . . . operates like a separate company."[101]

73.    Hartwell received an A rating from a ratings firm called Demotech.[102] Hartwell is regulated by the Tennessee Insurance Department, which has a subdivision specifically devoted to captive insurance.

74.    Effective on or around May 29, 2023, Stewart obtained a captive cell property insurance policy from Hartwell with up to $110,700,000 of casualty coverage.[103]

75.    Stewart's insurance expert Frank Hale Stewart Jr. (no relation to Frank Stewart, who owns Plaintiff corporation) used this hypothetical example to describe a captive cell insurance arrangement:[104]

> A captive insurance company very generally is a wholly owned insurance subsidiary of a parent company. So, for example, Acme Manufacturing is at the top of the corporate food chain. They form Acme Captive, which sits below it. Acme Manufacturing owns all the shares of

---

[100] Testimony of Frank Hale Stewart Jr.
[101] *Id.*
[102] Stewart Ex. 176.
[103] ECF No. 73 at 7(23); Stewart Ex. 140.
[104] Testimony of Frank Hale Stewart Jr.

> Acme Captive. Acme Manufacturing pays a premium to Acme Captive, which then provides insurance coverage to Acme Manufacturing.

In this example, Acme Manufacturing would be Plaintiff Stewart Development, LLC, and Acme Captive would be Stewart Development Protected Cell.

76. Stewart's captive cell was established by a Participation Agreement under which Stewart Development Protected Cell became "an unincorporated protected cell" of Hartwell.[105] Under the policy and the participation agreement, Stewart Development, LLC was responsible for all contributions of capital and surplus to the Stewart Development Protected Cell, as well as for all expenses and charges attributable to the protected cell.[106] That is, while Hartwell managed the Stewart Development Protected Cell, all financial burdens associated with the protected cell rested with Stewart Development, LLC.

77. The policy, issued by Hartwell "by and on behalf of Stewart Development Protected Cell," states in two places, "The First Named Insured is Self-Insured Through a Captive Insurance Company."[107] Stewart Development, LLC is the first named insured.[108]

78. Hartwell's role was "largely administrative," for which it was paid a service fee, but it had no obligation to contribute funds to the protected cell.[109]

79. To illustrate, Stewart Development, LLC paid an annual premium into the Stewart Development Protected Cell (the captive cell). Any claims covered under

---

[105] 111 Vets Ex. 86.
[106] 111 Vets Ex. 82; 111 Vets Ex. 86.
[107] 111 Vets Ex. 82.
[108] Stewart Ex. 140.
[109] Testimony of Frank Hale Stewart Jr.

the policy would be paid from Stewart Development Protected Cell. Stewart Development, LLC was responsible to pay additional premiums to the captive cell if the amount of a claim exceeded the balance in the captive cell's account.[110] No person or entity other than Stewart Development, LLC had any legal obligation to fund the captive cell.

80.    Hartwell bore none of the insured risk.[111] Rather, Hartwell merely administered the Stewart Development Protected Cell, the entirety of which was funded by Stewart Development, LLC.

81.    Baker explained that the Hartwell policy "filled the gap above $10 million for wind and above $40 million for all other perils, up to the limit of $110 million."[112]

82.    The captive cell policy obtained by Stewart in May 2023 did not transfer the risk of casualty loss from Stewart Development, LLC to a third-party.[113]

83.    Frank Hale Stewart Jr., Plaintiff's expert, opined that the Stewart Development Protected Cell was financially sound.[114] Frank Hale Stewart Jr.'s opinion was based on the assumption that Frank Stewart (the owner of Plaintiff Stewart Development, LLC) would fund Stewart Development, LLC's obligations under the captive cell policy to the extent necessary. Indeed, to obtain the policy from Hartwell, Frank Stewart was required to submit his personal financial statements.

---

[110] Testimony of Frank Hale Stewart Jr.; 111 Vets Ex. 82.
[111] Testimony of Frank Hale Stewart Jr.
[112] Testimony of Anderson Baker.
[113] Testimony of Frank Hale Stewart Jr.
[114] *Id.*

24

Since 1980, Frank Stewart has infused funding into Stewart Development, LLC and the Building as needed.[115]

84.  Stewart Development, LLC is insolvent because its debt exceeds the value of the Building.[116]

85.  Frank Stewart loaned Stewart the roughly $1.3 million needed to create the captive.[117] Frank Stewart's net worth is $127 million.[118]

86.  Frank Hale Stewart Jr. acknowledged that he was aware of no legal obligation for Frank Stewart to fund the captive cell policy.[119] Frank Hale Stewart Jr. further testified that, if Frank Stewart were unwilling or unable to fund the policy, Frank Hale Stewart Jr. would no longer contend that the captive cell was financially sound.

87.  Timothy Gold, 111 Veterans' insurance broker, testified that before determining whether an insurance company was financially sound, there would need to be "enough funds in reserve or access to enough funds in reserve by the listed parties that were responsible in the documentation."[120]

88.  Notwithstanding the captive cell policy, on June 14, 2023, 111 Veterans sent a letter to Stewart stating that Stewart was still in default.[121]

---

[115] Testimony of Mohamad Motahari.
[116] Testimony of Eric Lowenstein; Testimony of Ed Comeaux.
[117] Testimony of Mohamad Motahari.
[118] *Id*.; Stewart Ex. 132.
[119] Testimony of Frank Hale Stewart Jr.
[120] Testimony of Timothy Gold
[121] ECF No. 73 at 7(24); 111 Vets Ex. 91.

**E.    Stewart Attempts to Sell Heritage Plaza, While 111 Veterans Seeks To Exploit Stewart's Rent Roll**

89.    Occurring around the same time as and set against the backdrop of 111 Veterans' decision to default Stewart was Stewart's efforts to sell Heritage Plaza.

90.    In late April 2022, almost a year before 111 Veterans sent Stewart the default letter, Mohamad Motahari, CEO of Stewart, approached Colette Wharton, asset manager who oversees 111 Veterans, offering to sell the Building to Feil.[122]

91.    In furtherance of its efforts to sell the Building to Feil, effective as of May 1, 2022, Stewart and The Feil Organization executed a Confidentiality Agreement under which Stewart sent information to Feil.[123]

92.    The Confidentiality Agreement excluded from the term "Confidential Information" any information that "was known by or in the possession of the Recipient or its Representatives prior to being disclosed by or on behalf of the Disclosing Party pursuant to the Agreement."[124]

93.    On May 2, 2022, Stewart emailed 111 Veterans the signed Confidentiality Agreement along with a marketing package that included materials and information concerning Heritage Plaza.[125] The marketing package contained Stewart's "rent roll" as of April 1, 2022.[126]

---

[122] 111 Vets Exs. 24, 26. Although the Benson Group reportedly was interested in purchasing the Building in cooperation with The Feil Organization, the Benson Group ultimately decided not to make an offer on the Building. Testimony of Evan Stone; Stewart Ex. 116 ("Benson remains interested in pursuing Heritage, but they are only going to do so in collaboration with you [Feil])"; Stewart Ex. 187.

[123] ECF No. 73 at 7(15); Stewart Ex. 136.

[124] Stewart Ex. 136.

[125] Stewart Ex. 137.

[126] ECF No. 73 at 7(16); Stewart Ex. 137.

94.    A rent roll generally contains the rates a building's tenants are paying to the landlord for their leases and the tenants' lease expiration dates, among other information.[127]

95.    Rent rolls are included in a building's offering memorandum and are generally provided subject to confidentiality agreements.[128]

96.    The rent roll Stewart provided to Feil set forth lease expiration dates, minimum rent charges, minimum rent per square foot, and expense bases for Heritage Plaza's tenants.[129]  Stewart's rent roll contained information that was not publicly available.[130]

97.    According to the testimony of Arthur Sterbcow, Stewart's commercial real estate expert, information within Stewart's rent roll was valuable to a market competitor like The Feil Organization because it showed the rates Stewart's tenants were paying to rent space in Heritage Plaza, along with lease expiration dates. A competitive leasing broker could use that information to attract or steal Heritage Plaza's tenants.[131] Sterbcow testified that "[having the rent roll of a competitor was] like playing poker and being able to see the hand of the other person." Evan Stone, the Heritage Plaza listing agent, described rent rolls as "the holy grail of information. This is what leasing agents and competitors, tenant reps . . . want."[132]

---

[127] Testimony of Evan Stone; Testimony of Arthur Sterbcow.
[128] Testimony of Evan Stone.
[129] Testimony of Mohamad Motahari; Stewart Ex. 137.
[130] Testimony of Eric Lowenstein; Testimony of Evan Stone; Testimony of Arthur Sterbcow.
[131] Testimony of Arthur Sterbcow.
[132] Testimony of Evan Stone.

98.     There are only five Class A office buildings in Metairie—the three Lakeway Towers, Galleria, and Heritage Plaza—all of which were built in the 1980s. Demand for commercial office space in Metairie has been stagnant.[133] Few new tenants are entering the market for leased office space in Metairie. Accordingly, each building necessarily pursues the other buildings' tenants to fill vacant space.[134]

99.     It is not unusual for brokers to solicit tenants from competing buildings given the lack of demand for office space in the New Orleans market.[135] Arthur Sterbcow, Stewart's commercial real estate expert, testified that it was "perfectly all right" to lure tenants from a competitor building so long as the tenants are not being induced to break their leases.[136]

100.    After receiving the Heritage Plaza rent roll, Jeffrey Feil emailed Stewart's rent roll to Michael Siegel at Corporate Realty, the brokerage firm that handles leasing for Feil's commercial properties in the New Orleans area.[137] In the May 11, 2022, email, Jeffrey Feil told Michael Siegal to "[g]o get these tenants."[138]

101.    Jeffrey Feil was aware that Stewart would have to refinance its mortgage in April 2023. Eric Lowenstein had advised Jeffrey Feil that Stewart would have significant problems refinancing its mortgage if the Building's tenant occupancy decreased.[139]

---

[133] Testimony of Michael Siegel.
[134] Testimony of Michael Siegel; Testimony of Bruce Sossaman.
[135] Testimony of Bruce Sossaman; Testimony of Arthur Sterbcow.
[136] Testimony of Arthur Sterbcow.
[137] ECF No. 73 at 7(17); Stewart Ex. 295.
[138] Testimony of Arthur Sterbcow; Stewart Ex. 295.
[139] Testimony of Eric Lowenstein; Stewart Ex. 39.

102.    Siegel used the rent roll he received from Feil to create a list of Heritage Plaza tenants to target for Feil buildings, including tenants Carr, Riggs & Ingram ("Carr Riggs") and Audubon Engineering ("Audubon").[140]

103.    On May 12, 2022, Siegel emailed Bruce Sossaman and Scott Graf, leasing agents for Corporate Realty, a list of the targeted tenants based on Stewart's rent roll. In the email, Siegel wrote, "Super confidential . . . Let's discuss."[141] Sossaman was the agent responsible for leasing Feil's Lakeway buildings, and Graf was responsible for leasing the Galleria.[142]

104.    Graf responded to Siegel's email, noting that Heritage Plaza's rent "rates are going to be hard to compete with at Galleria and Lakeway."[143] Graf then suggested, "Maybe Mr. Feil will 'buy a tenant.'"

105.    On May 12, 2022, Siegel emailed Jeffrey Feil, Brian Feil (Jeffrey's son), and Collette Wharton, "Here are our targets," attaching a list entitled "Prospects Heritage Plaza (111 Veterans Blvd), from 4/1/2022 rent roll." Carr Riggs and Audubon were two of the Heritage Plaza tenants on the list.[144] At trial, when asked whether he was going to use the information in the attachment to pursue Stewart's tenants, Siegel responded, "[t]hat information and other information that we probably had on our own."[145]

---

[140] Testimony of Michael Siegel.
[141] Stewart Ex. 104.
[142] Testimony of Michael Siegel.
[143] Testimony of Michael Siegel; Stewart Ex. 105.
[144] Stewart Ex. 106.
[145] Testimony of Michael Siegel.

29

106.    Later that day, Siegel sent another email advising Jeffrey Feil, Brian Feil, and Colette Wharton that Stewart did not have "many long leases in which [operating expenses] would have increased significantly." [146] Drawing from information learned in the rent roll, Siegel stated, "The other detail about the rent roll to note is that there are very, very few stepped up rates," concluding that Stewart tended to do "flat rate deals." Siegel then remarked, "Good for the tenants but not good when you are trying to steal someone. Notwithstanding all this, we will take this info and do our best to get every tenant interested in one of our buildings."

107.    On May 12, 2022, Jeffrey Feil responded to Siegel: "Stop all your bs and go make some deals!! The mortgage is due next year. The chillers are old. Bathroom smell. The lobby looks like the name of the building! U know what I expect."[147]

108.    Meanwhile, Siegel assigned Sossaman and Graf specific Stewart tenants to target on behalf of Feil. On May 26, 2022, reporting his progress to Siegel, Sossaman stated that he had called and spoken to Carr Riggs and their broker and they were "agreeable to starting process in about 90 days."[148] Sossaman further noted that he was "[w]aiting for feedback on [Carr Riggs'] size, in 2020 they were 20k [rentable square foot], curious to see how big now."[149]

109.    On June 1, 2022, Eric Lowenstein emailed Stewart CEO Motahari regarding Stewart's efforts to sell Heritage Plaza to Feil. Lowenstein stated: "Hi Mamal. I spoke with Mr. Feil. At the current price and proposed deal structure, he

---

[146] Testimony of Michael Siegel. Stewart Ex. 107.
[147] Stewart Ex. 42.
[148] Testimony of Michael Siegel; Stewart Ex. 110.
[149] Testimony of Michael Siegel. Stewart Ex. 110.

has declined. Thank you for your time."[150] Lowenstein testified that he had examined the financial information provided by Stewart and came to the conclusion that Heritage Plaza was worth approximately $24 million—less than the price Stewart was seeking.[151]

110.    On August 30, 2022, Sossaman emailed an update to Siegel and Graf.[152] He reported that he had spoken with Carr Riggs' broker and was "hoping to have tour with Carr Riggs in September." He also reported that he had spoken with Audubon's broker "to see if any interest."

111.    On September 7, 2022, Sossaman prepared for the Feils a proposal recommending lease terms for Carr Riggs in Feil's Lakeway III building.[153] In the memorandum discussing the lease, Sossaman noted that Carr Riggs is "located at Heritage Plaza, expiring March 31, 2024, we toured them a year ago, but their expiration date was too far out."

112.    Around this time, Stewart retained Evan Stone of Goodwin Advisors to market and sell Heritage Plaza.[154] Stone contacted Jeffrey Feil on August 10, 2022 to notify Feil that he had been engaged to sell Heritage Plaza. Feil responded that Stewart's valuation was too high, but he also told Stone that "when you put it all together, I will re engage."[155]

---

[150] ECF No. 73 at 7(18); 111 Vets Ex. 30.
[151] Testimony of Eric Lowenstein; 111 Vets Ex. 27.
[152] Testimony of Michael Siegel; Stewart Ex. 113.
[153] 111 Vets Ex. 33.
[154] Testimony of Evan Stone.
[155] Stewart Ex. 46.

113.    Internally, The Feil Organization continued to discuss the possibility of owning Heritage Plaza. One plan considered by Jeffrey Feil and Brian Feil involved converting the Building from office space to residences, forcing the Building's commercial tenants into Feil-owned buildings, and thereby monopolizing the Metairie market.[156] On October 14, 2022, Brian Feil emailed Jeffrey Feil: "If you removed Heritage Plaza from the competition you control the class A market. Reduce competition. Can maybe drive the rents further in the market place. And make a first-class residential building. It's a long shot. But worth looking at. I think they call it a MOON shot."[157]

114.    On December 12, 2022, Jeffrey Feil emailed Siegel, Sossaman, and Graf an attachment containing Heritage Plaza tenant cost analysis, noting that Corporate Realty had "a lot If [sic] info" and that Heritage Plaza "[l]ooks like they are getting leasing done."[158]

115.    The following day, Siegel emailed Sossaman and Graf Heritage Plaza's rent roll with additional annotations and the instruction: "[K]eep confidential. Let's review by the end of this week."[159]

116.    Stone placed Heritage Plaza on the market in December 2022.[160] Stone testified that Heritage Plaza marketing materials were sent to almost 4,700 potential investors. Stone prepared monthly status reports for Motahari detailing the progress

[156] Stewart Ex. 87.
[157] Stewart Ex. 47.
[158] Testimony of Michael Siegel; Stewart Ex. 114.
[159] Testimony of Michael Siegel; Stewart Ex. 115.
[160] Testimony of Evan Stone; Stewart Exs. 194–96.

32

of his marketing efforts and investors' interest in the Building. On his March 9, 2023 status report, Stone wrote that "[they] have cleaned up the non-responsive investors and are down to a handful of investors." Stone also noted that Feil was the "most interested/communicative of all investors."

117. Stone transmitted an offering memorandum to Feil for the building in January 2023.[161] Lowenstein reviewed the information in it and reached the same conclusion as before—the building was not worth more than $24 million.[162]

118. On January 15, 2023, Jeffrey Feil sent an email to Stone discussing the insurance at Heritage Plaza and requesting a copy of Stewart's insurance policy.[163] In his January 15, 2023 email, Jeffrey Feil stated that he was asking in his capacity "as a buyer for the time being" and not as a ground lessor.[164] Feil also stated, "[d]o not know what is in the ground lease." Stone testified that he felt as though Feil was "fishing for information" beyond what a normal buyer would ask, and it "raised [his] antenna up a bit."

119. On or around January 20, 2023, 111 Veterans asked its insurance broker, HUB International, to investigate the cost to insure the Building.[165]

120. In a memorandum from Michael Siegel to Jeffrey Feil dated January 20, 2023, Siegel summarized his opinion of Feil's potential purchase of Heritage Plaza

---

[161] 111 Vets Ex. 35.
[162] Testimony of Eric Lowenstein.
[163] ECF No. 73 at 7(19); Stewart Ex. 188.
[164] Testimony of Evan Stone; Stewart Exs. 49–50.
[165] ECF No. 73 at 7(20).

along with the status of Corporate Realty's efforts to capture tenants from Heritage

Plaza: [166]

> I have reviewed the [offering memoranda] for . . . Heritage Plaza. As we discussed on the phone yesterday, it is my opinion that Heritage Plaza is well worth pursuing . . . Heritage Plaza rounds out your office building portfolio in Metairie and allows you to truly control the Class A portion of this market . . . . One of the benefits of receiving the subject OMs is the lease information on each building. I have reviewed all of the leases very closely with special attention on understanding the new leases in each building for 2020, 2021, and 2022 . . . . [T]his data will hopefully help us target and capture more new tenants in the future.

Siegel emailed this memorandum to Jeffrey Feil and Brian Feil on January 20, 2023.

121.    Brian Feil was not satisfied and emailed Siegel, copying Jeffrey Feil, Sossaman, Graf, Wharton, and Lowenstein: "Didn't we see the rent roll on this property months ago? Not sure how 'you missed some.' King Siegel of the market doesn't know all."[167]

122.    Under pressure from the Feils, on January 30, 2023, Siegel emailed Sossaman and Graf to keep "Quietly Target[ing] and Pursu[ing]" Stewart's tenants,[168] including tenants Carr Riggs and Audubon Engineering.[169] To this email Siegel attached a document containing lease expiration dates and prices per square foot for Heritage Plaza leases, along with annotations.[170]

123.    In a February 1, 2023 memorandum, Siegel committed to Jeffrey Feil and Brian Feil that Corporate Realty would be "more aggressive, more pro-active,

---

[166] Stewart Ex. 116.
[167] Testimony of Michael Siegel; Stewart Ex. 117.
[168] Testimony of Michael Siegel; Stewart Ex. 118.
[169] Stewart Ex. 118.
[170] *Id.*

and more creative in marketing the Feil office buildings in New Orleans."[171] Siegel attached a number of materials relating to Heritage Plaza tenants. In the memo, Siegel stated:

> I have reviewed these Rent Rolls and prepared a list of tenants (Enclosure #1) that Bruce and Scott will target (call on directly). We have to be careful how we use the information we were given in the Offering Memoranda for these two properties. This is why I have proposed a smaller list of targeted tenants to pursue, and we are not just sending out a mass mailing to every tenant.

124. On February 7, 2023, Siegel sent another memorandum to the Feils advising that Corporate Realty was continuing to "direct calls to specifically targeted tenants in Heritage Plaza," including Audubon and Carr Riggs.[172]

125. On February 14, 2023, Siegel exchanged emails with the Feils, beginning with Siegel providing an update on his team's efforts to recruit Heritage Plaza tenants on behalf of the Feils.[173] Siegel noted, "It is more effective, in light of the fact that we have the rent rolls, to make calls rather than just show up on someone's doorstep."[174]

126. Arthur Sterbcow, Stewart's commercial real estate expert, testified that Feil's sharing the rent roll with Corporate Realty was "clearly unethical and certainly violated the confidentiality agreement. That's the purpose of the confidentiality agreement [to prevent sharing such information]."[175] He further testified that, in his

---

[171] Testimony of Michael Siegel; Stewart Ex. 119.
[172] Testimony of Michael Siegel; Stewart Ex. 120.
[173] Stewart Ex. 121.
[174] Stewart Ex. 122.
[175] Testimony of Arthur Sterbcow.

years within the commercial real estate industry, he has never seen a company use a confidential rent roll to lure tenants from a competitor.

127.    In testimony at trial, Sossaman, who has been a longtime leasing agent for Feil properties in Metairie, sought to downplay the significance of receiving Heritage Plaza's rent roll in May 2022.[176] Sossaman testified that he keeps an extensive personal database tracking proposals he has made to tenants of non-Feil buildings, including Heritage Plaza. That information includes the lease terms, expiration date, and square footage involved in unsuccessful proposals—the most important data points for knowing when to approach a tenant in a competing building and what its space needs are likely to be.[177] Sossaman testified that, other than some information about the tenants' respective expense bases, which he would not normally track, there was virtually nothing in the rent roll for Heritage Plaza's larger tenants that Sossaman did not already possess.

128.    Sossaman testified he had been in touch with Carr Riggs' broker about Carr Riggs leasing space in a Feil building well before receiving Heritage Plaza's rent roll. According to Sossaman, Carr Riggs' broker approached Sossaman unsolicited in 2020, four years before its Heritage Plaza lease was due to expire. Because it was too early to negotiate toward a 2024 lease and because Carr Riggs was downsizing space, Sossaman put the discussions on hold. Sossaman testified that he then received a request for proposal from Carr Riggs's broker in 2021.[178] In 2022, Sossaman put

---

[176] Testimony of Bruce Sossaman.
[177] *Id.*
[178] *Id.*

together a proposal that included Lakeway's standard rental rate, making no use of Heritage Plaza's rent rolls.[179] The rental rate, rental term of 123 months, and improvement allowances were not influenced by information in the Heritage Plaza rent roll and were consistent with terms offered to other tenants.[180] After a series of proposals and counterproposals, Carr Riggs reached an agreement with Lakeway on a lease that commenced in the spring of 2024.[181]

129.    According to testimony from Sossaman, Audubon's broker, Martin Miller, contacted Sossaman unsolicited prior to May 2022 (when Sossaman received the Heritage Plaza rent roll), telling Sossaman that he would be sending a request for proposal when Audubon's lease expiration date approached. Miller sent Sossaman an email on March 13, 2023 seeking information about the availability of 35,000 square feet of office space, noting that Audubon's lease was expiring in October 2024.[182] In response, Sossaman prepared a proposal, again using Lakeway's standard rental rate and terms and using no information from the rent rolls.[183] This time however, the negotiations were not successful, with Audubon opting to renew at Heritage Plaza.[184] Under the terms of the 10-year lease that Audubon signed with Stewart, Stewart agreed to a $1.00 per square foot discount; Motahari testified that this discount was necessary for Stewart "to be competitive" and prevent Audubon from moving to a Feil building.[185]

---

[179] *Id.*; 111 Vets Ex. 33.
[180] Testimony of Colette Wharton; Testimony of Bruce Sossaman.
[181] ECF No. 73 at 7(25); Testimony of Bruce Sossaman; 111 Vets Ex. 66.
[182] Testimony of Bruce Sossaman; 111 Vets Ex. 58.
[183] 111 Vets Ex. 81.
[184] Testimony of Bruce Sossaman.
[185] Testimony of Mohamad Motahari; Stewart Exs 148, 406.

130.    Sossaman testified that MAPS, a litigation arbitration firm, had been a Lakeway tenant. However, Stewart successfully lured MAPS to sign a lease with Heritage Plaza in 2023. Sossaman explained, "Their proposal was superior to ours, and they won the tenant fair and square."[186]

131.    On March 17, 2023, one day after the default letter was sent, Jeffrey Feil sent an email to Collette Wharton, Siegel, and Sossaman, stating: "Mortgage is due in April."[187] Eric Lowenstein advised Jeffrey Feil that it would be difficult for Stewart to refinance its mortgage as of April 2023 if Heritage Plaza's occupancy rate decreased, meaning if it lost tenants.[188]

132.    Stone testified that Feil's decision to default Heritage Plaza hurt Stewart's ability to sell Heritage Plaza: "[h]aving the Feil issue" became "too much noise, too much risk."[189] Having an "adversarial landowner . . . dissuades people from being very interested." Heritage Plaza was taken off the market in April 2023.[190]

133.    On June 1, 2023, 111 Veterans' attorney wrote to members of the Feil Organization, "The deadline for the lessee to cure [the default] is June 19, but the mortgagee gets another 30 days. Once that date arrives, I will formally notify Stewart that the lease has been terminated and have a suit ready to file. Second, once we issue a formal notice of termination, we have to stop accepting rent."[191]

---

[186] Testimony of Bruce Sossaman.
[187] Stewart Ex. 318.
[188] Testimony of Eric Lowenstein.
[189] Testimony of Evan Stone.
[190] Testimony of Evan Stone; Stewart Ex. 199.
[191] Stewart Ex. 128.

134.    On June 15, 2023, Stewart filed the instant complaint against 111 Veterans seeking declaratory judgment and damages.[192]

135.    On June 27, 2023, the Louisiana Attorney General put 111 Veterans on notice that its conduct may be in violation of LUTPA.[193]

## III.   CONCLUSIONS OF LAW

1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. For purposes of diversity, Stewart is a citizen of Louisiana and Texas, and 111 Veterans is a citizen of New York, Massachusetts, and Florida. The parties stipulate that the amount in controversy exceeds $75,000.

2.      Where, as here, the Court's jurisdiction is based on diversity of citizenship, the Court applies the substantive law of the forum state, Louisiana. *See Wisznia Co. v. Gen. Star Indem. Co.*, 759 F.3d 446, 448 (5th Cir. 2014).

3.      Plaintiff has the burden of proof by a preponderance of the evidence in this civil trial. *See* Burden of Proof: Preponderance of the Evidence 3.2, Fifth Circuit Pattern Jury Instruction (2020); *Beauregard, Inc. v. S. Louisiana Bank*, No. CIV. A. 94-3331, 1995 WL 591331, at *5 (E.D. La. Oct. 4, 1995).

---

[192] ECF No. 1.
[193] Stewart Ex. 219.

## A.    Stewart's Breach-of-Contract Claim

### 1.    Legal Framework

4.    By its terms, the ground lease giving rise to Stewart's breach-of-contract claim is governed under Louisiana law.[194]

5.    Under Louisiana law, the elements for a breach-of-contract claim are "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Favrot v. Favrot*, 2010-0986 (La. App. 4 Cir. 2/9/11), 68 So.3d 1099, 1108-09, *writ denied,* 2011-0636 (La. 5/6/11), 62 So. 3d 127. "A failure to perform results from nonperformance, defective performance, or delay in performance." LA. CIV. CODE ANN. art. 1994. "An obligor is liable for the damages caused by his failure to perform a conventional obligation." *Id.*

6.    Louisiana law requires that contracts be performed in good faith. LA. CIV. CODE ANN. art. 1983. Although the Civil Code does not explicitly define "good faith," it explains that "[a]n obligor is in bad faith if he intentionally and maliciously fails to perform his obligation." LA. CIV. CODE ANN. art. 1997, cmt. (b).

7.    Bad faith requires finding "more than mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives." *MKR Servs., L.L.C. v. Dean Hart Const., L.L.C.*, 44,456 (La. App. 2 Cir. 7/8/09), 16 So.3d 562, 566. "An obligor in bad faith is liable for all the damages,

---

[194] Stewart Ex. 2.

foreseeable or not, that are a direct consequence of his failure to perform." LA. CIV. CODE ANN. art. 1997.[195]

8.     Finding a breach was in bad faith is only actionable when preceded by a finding that the actor breached the contract. *Favrot*, 68 So.3d at 1109-10.

### *2.     AOP Coverage Was Reasonably Obtainable*

9.     Stewart claims that 111 Veterans breached the ground lease with Stewart by improperly placing Stewart in default of Section 3(g) of the Fourth Amendment to the Ground Lease.

10.     Section 3(g) obligates Stewart to maintain insurance on Heritage Plaza:

> with financially sound and reputable insurance companies against loss or damage by fire, theft, lightning, windstorm, hail, explosion, riot and civil commotion, aircraft and vehicles, and smoke and such other casualties as are presently included in the so-called Extended Coverage Endorsement; and flood, if reasonably obtainable, . . . in any event in an amount not less than 100% of the actual replacement cost of such improvements (exclusive of excavation and foundation costs and costs of underground tanks, conduits, pipes, pilings and other similar underground items), less the actual physical depreciation thereof, and with not more than a $10,000 deductible from the loss payable for any particular occurrence.

11.     As this Court previously held,[196] the Court finds that the phrase "if reasonably obtainable" in Section 3(g) of the Fourth Amendment of the Ground Lease

---

[195] "The only differences between a typical breach-of-contract claim and a bad-faith breach-of-contract claim are that the latter alleges a culpable mental state and allows the recovery of all the damages from the defendant's failure to perform, rather than merely those that were reasonably foreseeable." *White v. State Farm Mut. Auto. Ins. Co.*, 479 F. App'x 556, 561 (5th Cir. 2012).

[196] ECF No. 83. "But the Court finds, consistent with Stewart's contention, that there is no genuine dispute of material fact that the phrase 'if reasonably obtainable' in Section 3(g) modifies all types of insurance listed in Section 3(g), not just flood insurance. This fact will be treated as established in the case." ECF No. 83 at 1.

modifies all types of casualties listed in Section 3(g) and is not limited to modification of "flood" only.

12.    It merits emphasizing that Section 3(g) itemizes categories of perils for which Stewart was required to secure insurance coverage, if reasonably obtainable, up to the replacement cost of the Building (less depreciation). Those specific categories include AOP (*e.g.*, fire, theft, lightning, explosion, riot and civil commotion) and non-AOP (*e.g.*, windstorm, flood). The Court finds that Section 3(g) should be read to require Stewart to obtain coverage up to replacement cost for each category of peril, if reasonably obtainable, and that Stewart's inability to reasonably obtain replacement cost coverage for any one category (such as wind) or to meet the deductibility requirement ($10,000 or less) does not extinguish Stewart's obligation to secure reasonably obtainable replacement cost coverage for all other categories of peril.

13.    In fact, as Stewart has conceded, it is routine for a broker to request full coverage on a property and for an underwriter to offer AOP coverage only.

14.    On March 16, 2023, 111 Veterans sent Stewart a default letter stating that Stewart was in breach of Section 3(g) for failing to maintain insurance at 100% of replacement cost less depreciation and failing to maintain deductibles of no more than $10,000.

15.    Stewart alleges that 111 Veterans breached the Ground Lease by improperly defaulting Stewart on March 16, 2023. It further alleges that the breach was in bad faith.

16.     Stewart's breach-of-contract claim fails if Stewart is unable to prove that 111 Veterans breached the lease when it placed Stewart in default. A well-founded notice of default on a contract cannot serve as the basis for a breach-of-contract claim, bad faith or otherwise, brought by the defaulting party. The Court thus examines whether 111 Veterans had grounds to place Stewart in default.

17.     As a starting point, Stewart does not dispute that the replacement cost of the Building in 2022 and 2023 was assessed to be close to $100 million. Moreover, Stewart agrees that the total loss limit of its insurance policy between May, 29, 2022 (the date the policy was renewed) and the March 16, 2023 default letter was $40,000,000. This $40,000,000 loss limit included coverages for loss of personal property in the amount of $250,000 and loss of income of $8,535,535, leaving coverage for damage to the building at $31,214,465. The Court thus concludes that Stewart did not maintain total coverage on Heritage Plaza at 100% of actual replacement cost less depreciation.

18.     The next question, then, is whether coverage up to replacement cost was "reasonably obtainable" in the insurance market in 2022 and 2023.

19.     The term "reasonably obtainable" is not defined in the ground lease and has no established meaning within the insurance industry. Moreover, the Court is unaware of any formal definition of the term under controlling authorities. Accordingly, "reasonably obtainable" must be given its generally prevailing meaning. LA. CIV. CODE art. 2047.

20.    111 Veterans proposes that the Court define "reasonably obtainable" as whether a reasonable commercial property owner would deem the required insurance coverages to be overly burdensome given contractual obligations, cost, and risk.[197] This framing is sensible and aligns with how the term "reasonable" has been defined in other contexts under Louisiana law—pursuant to an objective, rather than a subjective standard. *See Atlas Iron & Metal Co. v. Ashy*, 2005-458 (La. App. 3 Cir. 1/4/06), 918 So.2d 1205, 1211, *writ not considered*, 2006-0296 (La. 4/28/06), 927 So. 2d 276 ("[T]he reasonable man standard is unequivocally an objective standard, not a subjective one[.]"); *Wright v. Waguespack*, 2002-0603 (La. App. 1 Cir. 12/20/02); 836 So.2d 436, 438 (adopting a definition of "reasonable diligence" as the "fair degree of diligence expected from someone of ordinary prudence under circumstances like those at issue") (quoting Black's Law Dictionary 468 (7th ed. 1999)). *See also* REASONABLE, Black's Law Dictionary (12th ed. 2024) (defining "reasonable" as "fair and proper under the circumstances"). 111 Veterans' formulation of "reasonably obtainable" thus asks the Court to consider, from the perspective of an ordinary commercial property owner, whether its contractual obligations, risk, and insurance costs justify obtaining coverage in this instance up to the building's replacement cost less depreciation.

21.    Having weighed the evidence, the Court finds that wind, flood, and named storm coverages were not reasonably obtainable at total loss limits in 2022 and 2023. All witnesses essentially agree with this proposition. There is also

---

[197] ECF No. 97.

widespread agreement that deductibles of $10,000 or less for wind and storm coverage were not reasonably obtainable during this timeframe.

22.    But the balance of evidence shows that AOP coverage up to replacement cost (less depreciation) was reasonably obtainable for Heritage Plaza in 2022 and 2023.

23.    It is important to remember that after Hurricane Ida, premiums for wind coverage spiked. But, critically, AOP premiums increased at a pace in line with inflation.

24.    The Court credits the three witnesses who provided consistent and corroborating testimony that AOP coverage at the Building's replacement cost value was available and reasonably obtainable in 2022 and 2023. Those witnesses were Andrew Schutzman, Feil's insurance consultant; Eric Lowenstein, Feil's Chief Financial Officer; and Timothy Gold, 111 Veterans' insurance brokerage expert.

25.    Schutzman, an outside insurance consultant who assisted Feil in putting together insurance programs for over twenty years, testified that he never encountered difficulty in obtaining AOP coverage for Feil's Louisiana properties for their total insured value ("TIV") at a commercially reasonable rate. Lowenstein, who worked as part of a group at Feil that reviews insurance renewals, pricing, limits, and capacity, testified that AOP coverage in 2023 at replacement cost limits for commercial properties in southeast Louisiana was both available and cheap. And Gold, whom 111 Veterans tendered as an expert in the placement of property insurance coverage on commercial property, testified that he has placed coverage for

thousands of properties and rarely had difficulty placing AOP coverage on commercial properties in New Orleans at TIV limits at a reasonable cost. Gold also testified that his understanding of the AOP coverage market was informed by three experienced surplus line brokers, whose input he sought in evaluating Heritage Plaza's coverage options. Gold had "full confidence" that it would have been possible to purchase AOP coverage at a reasonable price in 2022 and 2023 for the total insured value of Heritage Plaza.

26.    This testimony was consistent with and substantiated by evidence of the insurance coverage for the three Lakeway buildings between 2020 and 2024. Lakeway III had full limits AOP coverage for the policy period beginning June 11, 2022 based on a total insured value of $127,569,795. Under Lakeway III's layered approach, in 2022 it cost Feil an additional $71,500 premium to increase AOP coverage from $50 million to $127,569,795. In the 2023-2024 renewal cycle, Feil paid $156,794 to increase Lakeway III's AOP coverage from $30 million to its TIV of $134,040,047. Similarly, Lakeway I and II had full limits coverage for the same policy periods based on a total insured value in excess of $200 million.

27.    Anderson Baker, Stewart's insurance broker whose firm has worked with Stewart since approximately 2007, placed Stewart's May 2022/2023 policy on Heritage Plaza. Baker was unaware of the insurance requirements imposed under Section 3(g) until he received a copy of the March 16, 2023 default letter. As far as Baker knew, Stewart's insurance obligations to its mortgage lender were satisfied

upon obtaining a $40 million total loss policy, even though the replacement cost for the Building exceeded that loss limit.

28.    In the spring of 2022, Heritage Plaza's TIV had increased to $106,226,647. Baker initially sought insurance coverage for Heritage Plaza up to the TIV. But AmWINS, the surplus lines broker used by Baker, informed Baker that AmRISC, the insurance consortium with which AmWINS contracts, was only willing to offer a $40 million policy. Baker did not attempt to find another underwriter to provide a layer of AOP coverage above the $40 million loss limit. That is in part because Stewart's CEO Motahari, while unhappy with the cost of the AmRISC policy, was satisfied that he had $40 million of coverage and was uninterested in seeking higher AOP limits from elsewhere. Accordingly, Baker, unaware of the requirements of the ground lease, adhered to Motahari's wishes and made no effort to find a layer of AOP coverage above the $40 million offered by AmRISC.

29.    After 111 Veterans placed Stewart in default in 2023, at the request of Stewart, Baker sought quotes for coverage up to replacement cost. Baker contacted two—and only two—insurance underwriting companies, AmWINS and Risk Place Services. Neither company was willing to offer total loss coverage at Heritage Plaza's replacement cost. But, critically, Baker made no effort to seek AOP coverage up to replacement cost separate from wind coverage; according to Baker, "[t]hat was not my charge." Stewart requested only for Baker to find all-perils coverage (rather than AOP coverage) at TIV limits, which neither AmWINS nor Risk Place Services was

47

willing to do. Moreover, Baker made no effort in either 2022 or 2023 to obtain a layer of additional AOP coverage above AmRISC's $40 million policy.

30.    Baker speculated that, if he had requested separate AOP coverage, the cost of such coverage would have been exorbitant in 2022 and 2023. But Baker's contention is uncorroborated, uninformed by articulable facts, and inconsistent with the weight of other evidence, and thus not credited by the Court.

31.    Moreover, even Baker acknowledged that Feil, for his Lakeway III property, paid reasonable premiums to obtain additional layers of AOP coverage up to the TIV of the building. For Lakeway III, Feil paid $71,500 in the 2022/2023 insurance cycle to increase AOP coverage from $50 million to its TIV of $127,569,795. Baker found this additional premium to be reasonable.

32.    Accordingly, the Court finds that, as of the May 29, 2022 policy renewal, Stewart was in default of the ground lease for failing to obtain AOP coverage for Heritage Plaza at full replacement cost less depreciation as required by Section 3(g). And because Stewart in fact was in default of the lease, 111 Veterans did not breach its contract with Stewart by providing notice of Stewart's default on March 16, 2023.

33.    Stewart advances numerous counterarguments, which the Court addresses in turn.

### 3.    The Parties' History of Allowing Stewart to Maintain AOP Coverage Less Than Replacement Cost Is Not Proof That AOP Coverage Was Not Reasonably Obtainable in 2022/2023

34.    Stewart claims that the historical practice of permitting Stewart to maintain less-than-full TIV coverage should inform the Court's determination of what constitutes "reasonably obtainable" coverage.[198] The Court disagrees.

35.    Beginning in 2013, Stewart had been permitted to maintain $40 million of insurance coverage on Heritage Plaza, even though the replacement cost of the Building was higher. Indeed, 111 Veterans' March 16, 2023 default letter was the first time any party had objected to Stewart's coverage limits.

36.    Stewart contends that, since 2013, the Building was not insured up to replacement cost for AOP because "the parties agreed that such coverage was not 'reasonably obtainable.'"[199] No evidence in the record supports this.

37.    It is true that in 2013 the lender agreed to, and the landlord did not oppose, Stewart's coverage limit of $40 million even though it was below the Building's almost $50 million replacement cost. But Stewart asks the Court, based on this concession by the lender, to conclude that the lender, landlord, and Stewart came to a meeting of the minds that $40 million was a reasonably obtainable amount of coverage for Heritage Plaza.

---

[198] ECF No. 98 at 3–5; ECF No. 100 at 4–5. In its complaint, Stewart makes a distinct but related argument that was foreclosed during pretrial litigation. Specifically, Stewart requested a declaratory judgment that "[b]y accepting the lower limits obtained by Stewart and not objecting for several years, [111 Veterans] is estopped from or has waived any objection to the insurance limits obtained by Stewart[.]" Section I of the Court, who was originally allotted this case, granted 111 Veterans' Rule 12(b)(6) motion as to Stewart's claim that 111 Veterans, through its inaction, waived objection to Stewart's insurance limits. ECF No. 13 at 11–15. The issue was not raised during the trial.

[199] ECF No. 100 at 5, 8.

38.     To the contrary, there is no evidence that Stewart's lender in 2013 was motivated by Section 3(g) or the question of "reasonable obtainability" when it agreed to the $40 million coverage. Stewart offers no proof that any party, Stewart included, made an informed determination in 2013 that $40 million met the definition of "reasonably obtainable"—or the inverse, that anything beyond $40 million was not "reasonably obtainable" as defined in Section 3(g). The mortgage lender merely sent an email in 2013 agreeing to accept the $40 million limit in coverage. The lender communicated this decision with no reference to Section 3(g) or analysis of market factors supporting a determination that a $40 million limit was all that was reasonably obtainable.

39.     Stewart likewise points to no evidence that, after 2013, it was permitted to carry less AOP coverage because the parties made an informed determination that full limits AOP coverage was not reasonably obtainable. As the Court heard throughout the trial, costs of insurance can increase or decrease from year-to-year. So can the replacement cost of a building. Whether insurance coverage for a certain casualty and at a certain limit is reasonably obtainable can change—which explains why Section 3(g) requires an amount of coverage based on a variable like the replacement cost of the building and not a fixed dollar amount. Just because the parties had an understanding from 2013 to 2021 that $40 million in coverage on Heritage Plaza was acceptable does not necessitate the conclusion that $40 million of coverage was "reasonably obtainable" in 2022 and 2023.

40.     Anderson Baker, who handled the placement of insurance for Stewart, was not even aware of Section 3(g) or its insurance requirement until receiving the March 2023 default letter. Stewart cannot plausibly claim that insurance coverage decisions were informed by a desire to satisfy Section 3(g) and secure only such coverage that was "reasonably obtainable."

41.     Stewart nonetheless posits that its own judgment on what constitutes reasonably obtainable coverage under Section 3(g) should be "given the most, if not exclusive, weight."[200] That is, according to Stewart, its subjective judgment as to what level of coverage is reasonably obtainable should control the outcome. That assertion fails. First, it renders compliance with Section 3(g) subject to Stewart's whim. Stewart could decide, for example, that its dire finances justify a lower level of coverage than a reasonable owner otherwise would consider appropriate. Or it could simply decide that Section 3(g)'s requirements are inherently unreasonable. In Stewart's view, it can buy whatever coverage it wishes and that coverage *de facto* becomes all that is "reasonably obtainable" for purposes of Section 3(g), leaving the ground lessor no choice but to accept it. But a suspensive condition, such as "if reasonably obtainable," that depends solely on Stewart's whim would render Section 3(g) null. LA. CIV. CODE art. 1770. "Louisiana law does not favor the interpretation of contract conditions as purely potestative"—*i.e.*, dependent on the whim of one of the parties. *Sam's Style Shop v. Cosmos Broadcasting Co.*, 694 F.2d 998, 1002 (5th Cir.

---

[200] ECF No. 98 at 5.

1982). "[I]nstead, whenever possible agreements are to be interpreted to preserve their validity." *Id*.

42.     Stewart cannot decree unilaterally that it need not purchase reasonably obtainable insurance consistent with the coverage requirements of Section 3(g) simply because it would prefer to purchase less insurance.

### 4.     *Comparisons Between Heritage Plaza and the Lakeway Properties Are Useful*

43.     Stewart argues that 111 Veterans' reliance on comparisons between Heritage Plaza and Lakeway properties is misplaced because (1) unlike Heritage Plaza, Lakeway I and II were insured under a program that combined the two buildings for coverage, and even so the buildings were not insured up to their replacement cost for the period 2023-2024; and (2) unlike Heritage Plaza, Lakeway III was insured only as to the exterior (shell) of the building and did not include coverage for interiors.[201]

44.     As for Lakeway I and II, Stewart is correct that the buildings were not insured up to replacement cost for 2023/2024—a fact that Stewart offers no evidence to explain, other than speculation that insurance costs were too expensive for that year. But for the 2022/2023 cycle, Lakeway I and II were insured up to their full TIV. In fact, for that policy period, Feil paid only $150,000 (out of a total premium of roughly $2.7 million) to purchase over $154 million of layered AOP coverage, taking coverage from $50 million to the full TIV of $204,591,057.

---

[201] ECF No. 100 at 5–6.

45.    As for Lakeway III, Stewart argues that any comparison with Heritage Plaza is inapt because Lakeway III's coverage applied only to the exterior and did not include interiors, whereas Heritage Plaza's coverage included interior walls, fixtures, and the like. This may be true, but the value of Heritage Plaza interiors was relatively small compared to the replacement cost of Heritage Plaza on the whole. According to the 2022 CoreLogic report—*i.e.*, the report that was used to establish Heritage Plaza's 2022 TIV—the replacement cost for all interiors was approximately $10 million, a figure that represents less than 10% of the total Heritage Plaza replacement cost ($106,226,647).

46.    Moreover, Lakeway III had a comparable, albeit slightly higher, TIV during the same timeframe ($127,569,795). Stewart has not shown that the small distinction in the scope of coverage warrants disregarding Lakeway III as a reliable comparator for the same time period. As previously noted, between 2020 and 2023, Feil paid premiums between $65,000 and $71,500 to obtain "layered" AOP coverage that increased Lakeway III's loss limit from $50 million to its TIV of $127,569,795. In the 2023-2024 renewal cycle, Feil paid $156,794 to increase Lakeway III's AOP coverage from $30 million to its TIV of $134,040,047. In his trial testimony, Baker acknowledged that these additional premiums were a reasonable price for the amount of additional AOP coverage that Lakeway III obtained.

47.    Furthermore, Stewart complains that "[n]ot a single witness could point to a similar building insured for AOP coverage up to replacement cost."[202] But as the

[202] ECF No. 100 at 6.

trial evidence showed, there are only three sets of buildings in the Metairie Class A office market: Heritage Plaza, the Lakeway buildings, and Galleria. Given the narrow universe, it is hard to discount Lakeway III as a reliable comparator building in the Metairie market.

### 5.    111 Veterans Did Not Forfeit Its Right to Default Stewart for Failure to Maintain AOP Coverage or Its Ability to Argue the Same at Trial

48.    Stewart contends that 111 Veterans should be barred from claiming that Stewart was required to obtain reasonable AOP coverage under Section 3(g) because (1) 111 Veterans did not specifically cite insufficient AOP coverage as its grounds for default in the March 16, 2023 letter, and (2) according to Stewart, 111 Veterans did not make known its intent to default Stewart for insufficient AOP coverage until the third day of trial.[203]

49.    As to the first argument, the default letter claimed that Stewart was in violation of Section 3(g) because "property insurance in the amount of $110,700,000.00 [is] required," but "the amount of property insurance currently being carried by Tenant is deficient under the Lease by any reasonable measure." The letter did not specify that Stewart was being placed in default for failing to obtain AOP coverage at replacement cost limits.

50.    Under the terms of the lease, any failure by Stewart to "promptly and fully perform" its obligations under Section 3(g) is an "Event of Default" that "shall be considered to exist for all purposes of this lease, immediately upon its happening,

---

[203] ECF No. 98 at 5–11; ECF No. 100 at 1–4.

occurrence or existence." As the Court has found, Stewart was in default even before 111 Veterans sent Stewart the notice of default. Specifically, Stewart was in default when it failed to secure, much less attempt to secure, AOP coverage up to replacement cost for the 2022/2023 renewal cycle. The event of default occurred at the moment the May 29, 2022 insurance policy went into effect.

51.     It is irrelevant that 111 Veterans did not reference Stewart's insufficient AOP coverage in the default letter. With or without notice, the event of default had already occurred. 111 Veterans had no obligation to reference AOP coverage in the letter, under either Louisiana law or the terms of the lease. Under Louisiana law, notice is not required "absent an express requirement of notice of default in the agreement under consideration." *Gen. Elec. Capital Corp. v. Se. Health Care, Inc.*, 950 F.2d 944, 952 (5th Cir. 1991). *Accord* La. Civ. Code Ann. art. 1989 ("Damages for delay in the performance of an obligation are owed from the time the obligor is put in default. Other damages are owed from the time the obligor has failed to perform."). Giving an obligor notice of default is not necessary when seeking damages for defective performance, as 111 Veterans sought against Stewart. LA. CIV. CODE ANN. art. 1989, rev. cmt. (c).

52.     Moreover, notice of default was not required under the lease unless 111 Veterans sought to terminate the lease. Section 30 of the lease states, "Lessor's right to elect to terminate this lease for [a violation of Section 3(g)] shall not accrue until after 60 days following written notice by Lessor to Lessee specifying the instance or instances of default." 111 Veterans, therefore, must give notice and a 60-day cure

period before terminating the lease. During that 60-day window, Stewart has a right to cure the event of default before termination.

53.    But 111 Veterans has not terminated the lease. There is no evidence that 111 Veterans in fact terminated or communicated termination of the lease to Stewart. In the default letter, 111 Veterans made clear that it had *not* terminated the lease, stating, "Landlord reserves the right to exercise all of its available rights and remedies under the Lease, including without limitation termination of the Lease, if the defaults are not cured within the applicable time periods under the Lease." This statement reflects that 111 Veterans is contemplating a lease termination to occur sometime in the future; it has not happened yet. Stewart also cites emails over the ensuing weeks and months among Feil officers and 111 Veterans' attorney discussing a plan to terminate the Stewart lease. But no termination notice was communicated to Stewart, which means the lease was never terminated. And because the lease has not been terminated, 111 Veterans is under no obligation to provide notice of default for the event of default to exist, much less provide specific notice of Stewart's insufficient AOP coverage.

54.    Stewart advances a different reading of Section 30, arguing that notice of default is both required under the lease and must articulate "specifically" the basis for default. Stewart claims: "Section 30 dictates that 'notice is required' and that there is no breach unless 'the default as specifically set forth in said notice, shall not be cured within the time set forth in such notice.'"[204] This argument misreads and

---

[204] ECF No. 98 at 8.

misinterprets the requirements of Section 30. The applicable Section 30 provision actually states:

> Where, by the terms of this Section, notice is required and the default as specifically set forth in said notice, shall not be cured within the time set forth in such notice, and as provided in this Section, this lease and all Lessee's rights and interests under it shall terminate and be at an end[.]

55.     Under this provision, *if* notice is required (which it was not, for an event of default to come into existence) and *if* Stewart failed to cure the default as specifically set forth in the notice, then Stewart's rights and interests shall terminate. The provision does not state, as Stewart contrives, that before Stewart can be found in default of the lease, the default notice must "specifically" identify the bases for the default. Again, Stewart was in default immediately upon the "happening, occurrence or existence" of an Event of Default—here, failing to obtain AOP coverage up to replacement cost in 2022. It is immaterial that 111 Veterans did not specifically reference AOP coverage in the default letter.

56.     Moreover, the cases cited by Stewart in support of its contention that AOP-specific notice was required are inapposite. In those cases, the leases at issue required a notice of default followed by a cure period before any action could be taken for breach. *See Walker v. Ford Leasing Div. Co.*, 1995 WL 498866, (E.D. La. Aug. 21, 1995) *3 (in eviction suit, lease required written notice of default and 30 days to cure); *McCrary v. Park South Properties*, 560 So.2d 38, 47 (La. App. 1 Cir.), writ denied, 563 So. 2d 1156 (La. 1990) (formal written notice of default required, with 30-day cure period, before any action for breach of lease can be asserted). "It is the Lease that

provides the governing law between the parties on this issue." *Walker*, 1995 WL 498866, at *3 (citing *McCrary*, 560 So.2d at 45 ("Agreements legally entered into have the effect of laws on those who have formed them.")).  Here, the ground lease required no notice of default to Stewart because 111 Veterans had not attempted to terminate the lease. Stewart was in default at the moment the May 29, 2022 policy became effective, not the moment it received the default letter.

57.    Turning to Stewart's second argument—that 111 Veterans did not make known its intent to default Stewart for insufficient AOP coverage until the third day of trial—Stewart argues that it suffers prejudice by having to defend against a new theory of liability first introduced in the middle of trial. This claim has no basis in the record.

58.    Stewart takes aim at 111 Veterans' "pleadings [as] focus[ed] only on wind and storm coverage and deductibles and are devoid of any reference to AOP." Indeed, 111 Veterans' counterclaim makes no mention of Stewart's insufficient AOP coverage, but it also does not specifically allege insufficient wind or named-storm coverage limits.[205] The counterclaim generically notes: "The coverage limits at all times from March 16, 2023 to date have fallen substantially short of the level required by Section 3(g), and the deductible for windstorms at all times from March 16, 2023 has been substantially higher than the $10,000 cap set by Section 3(g)."

59.    Despite the general language of the counterclaim, 111 Veterans made known its intent to challenge the sufficiency of Stewart's AOP coverage at multiple

---

[205] ECF No. 15 ¶ XI(a).

stages of this litigation. For instance, Stewart's insufficient AOP coverage was squarely presented in the Pretrial Order without any objection from Stewart. Contested Issue of Law #5 states in relevant part:

> If the phrase "if reasonably obtainable" applies to all types of casualties listed, whether coverage for "all other perils" was reasonably obtainable on or about March 16, 2023 at limits equal to 100% of the actual replacement cost of Heritage Plaza (exclusive of the items delineated in Section 3(g)) less actual physical depreciation . . . .[206]

60.    Under Federal Rule of Civil Procedure 16(d), a pretrial order "controls the course of the action unless the court modifies it." A party has presented an issue in the trial court if it has been raised "in either the pleadings or the pretrial order, or if the parties have tried the issue by consent." *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 331 (5th Cir. 1994).

61.    Moreover, the adequacy of Stewart's AOP coverage did not arise for the first time as an issue in the Pretrial Order. 111 Veterans raised the issue directly in its opposition to Stewart's Motion for Partial Summary Judgment filed in June 2024.[207] 111 Veterans raised the issue again in its proposed findings of fact, noting, "[t]he evidence before the Court establishes that 'all other perils' coverage at full replacement value limits was reasonably obtainable in the Metairie Class A office market in 2022 and 2023."[208] Stewart filed both a *Daubert* motion directed to Timothy Gold's testimony and an omnibus motion *in limine*, but neither motion sought to exclude evidence concerning AOP coverage. The issue was also raised throughout the

---

[206] ECF No. 73 at 26.
[207] ECF No. 45 at 20.
[208] ECF No. 80 at 21–22.

trial, including in testimony of Eric Lowenstein on Day 1, and Stewart never objected to questions bearing on AOP coverage.

62.     Accordingly, even were the Court to conclude that the sufficiency of AOP coverage was not properly raised in either the pleadings or the pretrial order, they were tried with the implied consent of the parties. Fed. R. Civ. P. 15(b)(2). Whether an issue has been tried with the implied consent of the parties depends on (a) whether the parties recognized that the issue entered the case at trial, (b) whether evidence on the issue was introduced without objection, and (c) whether the opposing party was prejudiced. *United States v. Shanbaum*, 10 F.3d 305, 312–13 (5th Cir. 1994). All three factors weigh in favor of permitting 111 Veterans to argue Stewart's default based on insufficient AOP coverage.

63.     In short, the question of whether Heritage Plaza's AOP coverage complied with Section 3(g) was properly before the Court at trial, whether viewed through the prism of the pleadings, the pretrial order, the pretrial briefing, or Rule 15(b)(2).

### 6.     *Stewart Places Undue Significance on Heritage Plaza's Claims History*

64.     Stewart argues that, in evaluating reasonable obtainability, the Court must take into account the improbability of an AOP event ever requiring a full replacement of the Building.[209] This is particularly so, according to Stewart, when the largest AOP loss the building ever sustained was approximately $100,000 after Hurricane Katrina.

---

[209] ECF No. 98 at 10–11.

65.    Stewart places too great an emphasis on this factor, and the Court is not persuaded to rely so heavily on history as a guide. One could imagine any number of scenarios (unpleasant as they may be) that would result in a total loss of the Building due to an AOP casualty. In fact, this is what insurance companies do—imagine the worst scenarios and price their policies according to the likelihood of that risk. Just because a catastrophic loss from an AOP casualty has not happened to the Building, or the risk might be exceedingly low, does not mean that Stewart is entitled to choose its own level of AOP coverage; Stewart knowingly agreed to obtain reasonably obtainable replacement cost coverage when it agreed to Section 3(g), the evidence shows AOP coverage was available at a reasonable cost in 2022 and 2023, and even Stewart's insurance broker (Baker) admitted that the cost of full limits AOP coverage on a comparable property in the market (Lakeway III) was reasonable.

### 7.    *Stewart's Captive Cell Policy Did Not Cure Default*

66.    In an attempt to cure the default alleged in the March 16, 2023 notice, Stewart obtained a Tennessee captive cell policy dated May 15, 2023. This so-called "protected cell" policy is a form of self-insurance authorized under Tennessee law.

67.    The policy is administered by Hartwell Insurance Co., although Hartwell's role is largely administrative. Hartwell gets paid a service fee, but it has no obligation to contribute any funds to the protected cell.

68.    The policy designates Stewart as the "First Named Insured" and states on its first page, "The First Named Insured Is Self-Insured Through a Captive Insurance Policy." The policy's liability limits purport to provide Heritage Plaza with

all the insurance coverage required under Section 3(g) that was not already being provided under the policy purchased through Gallagher.

69.    At the inception of the captive cell policy, Stewart was required to place $1,158,950 into a segregated claims account. To the extent losses on future claims exceed the balance in the segregated claims account, Stewart must place additional amounts into the account in multiples of $500,000 sufficient to pay the losses.

70.    All financial burdens associated with the protected cell rest with Stewart Development, LLC.

71.    There is no reinsurance treaty in effect with a third-party insurer for any of the risk insured against by the captive cell policy. And while Frank Stewart's personal financial statement was submitted to the Tennessee authorities to obtain regulatory approval for the policy, Mr. Stewart has no contractual or other legal obligation to fund any of the losses insured against by the captive cell policy. In short, the only entity required to fund the obligations under the captive cell policy is Stewart itself.

72.    Section 3(g) requires that all insurance acquired by Stewart for Heritage Plaza be "with financially sound and reputable insurance companies." The captive cell insurance does not satisfy this condition because the Stewart Development Protected Cell, the insurance vehicle providing the coverage, is not financially sound.

73.    Stewart Development, LLC is insolvent, with liabilities far exceeding the value of its assets. As a consequence of its insolvency, it funded its initial contribution to the segregated claims account with funds borrowed from a related

entity controlled by Frank Stewart. But Frank Stewart in under no legal obligation to fund the captive cell policy. The Court credits the expert testimony of Frank Hale Stewart Jr. insofar as he testified that, if Frank Stewart were unwilling or unable to fund the policy, the captive cell would not be financially sound.

74.    Stewart Development, LLC is the sole entity with the legal obligation to fund losses covered by the captive cell policy.

75.    Under Louisiana law, which governs under the ground lease, insurance is "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." La. Rev. Stat. Ann. § 22:46(13)(a). Here, under the Stewart Development Protected Cell policy, Stewart Development, LLC functions as both insurer and insured, obligated to indemnify itself against losses up to $110 million despite lacking the resources to pay an initial $1.2 million premium.

76.    For these reasons, the captive cell policy was not issued by a financially sound insurer and does not represent any shifting of risk. It therefore does not cure Stewart's default under Section 3(g).

### 8.    Stewart Has Not Shown That 111 Veterans Breached the Lease by Failing to Perform an Obligation

77.    Even if the Court were to find that AOP coverage was not reasonably obtainable at the Building's replacement cost level, Stewart still does not prevail in its breach-of-contract claim because it fails to show that 111 Veterans failed to perform an obligation under the lease.

78.     Stewart's claim for breach against 111 Veterans is that the defendant improperly defaulted Stewart on March 16, 2023, and did so in bad faith. Stewart makes no other claims for breach beyond alleging that it was improperly defaulted.

79.     Louisiana Civil Code Article 1756 defines "obligation" as follows: "An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee. Performance may consist of giving, doing, or not doing something." Under Louisiana law, a breach of contract occurs when an obligor "undertak[es] an obligation to perform" and then "fail[s] to perform the obligation," resulting in damages to the obligee. *Favrot*, 68 So. 3d at 1108–09.

80.     Stewart asserts that 111 Veterans, as the obligor, committed breach of contract when it improperly defaulted Stewart for violating Section 3(g). In its post-trial briefing, Stewart more narrowly claims that 111 Veterans breached Section 2 of the ground lease, which requires that "Lessee shall be maintained in the peaceful and undisturbed possession and enjoyment of the leased premises."[210]

81.     Supporting its contention that placing Stewart in default violated Section 2, Stewart cites *Stroope v. Smith*, 50,685 (La. App. 2 Cir. 5/18/16), 199 So.3d 612, 626, on reh'g (July 28, 2016). But *Stroope* is factually distinct. There, the court found that the lessor-defendant violated his duty to provide the lessee-plaintiff with "peaceful possession of the leased premises" when the defendant entered the premises without permission of the plaintiff; took it back for his own purposes; locked the

---

[210] ECF No. 98 at 15 (citing Stewart Ex. 2 § 2). Stewart also alleges that 111 Veterans breached Section 30 of the lease. The Court addressed the Section 30 argument *supra*.

plaintiff out of the property even though the plaintiff's personal property remained on the premises; failed to provide notice of the plaintiff's alleged default or make a demand for repayment of rent before reentering the leased property; and failed to provide the plaintiff with a cure period. By contrast, here, 111 Veterans sent Stewart a default letter claiming Stewart was not upholding its insurance obligations under the lease. 111 Veterans did not terminate the lease, seize the property, or otherwise deny Stewart the use of Heritage Plaza after sending the default letter. *Compare Lakefront Mgmt. Auth. v. J & J Partners, L.L.C.*, 2025-0324 (La. App. 4 Cir. 2/13/26) (finding that "filing a Petition for Possession and Rule to Evict does not itself amount to a disturbance of [the lessee's] peaceful possession"), *and Naquin v. Bollinger Shipyards, Inc.*, 2013-1638 (La. App. 1 Cir. 5/2/14), 147 So.3d 207, 212, writ denied, 2014-1091 (La. 9/12/14), 148 So.3d 933 (holding lawsuit brought by lessor to cancel lease was not a "disturbance" sufficient to establish a breach of the warranty of peaceful possession), *with Creole Corp. v. McMillan*, 379 So.2d 805, 807 (La. Ct. App. 1980) (finding that the act of illegally padlocking a premises and denying a tenant's use violated the peaceful possession guaranteed by the lease). As 111 Veterans notes in its post-trial briefing: "There is no obligation under the Ground Lease (or any contract, for that matter) [for 111 Veterans] to assert only successful breach of contract claims."

82.    Of course, all obligations, including contractual ones, must be performed in good faith. LA. CIV. CODE arts. 1759, 1983. But the "implied duty of good faith . . . arises only in the context of performance of a contract." *Jones v. Honeywell Int'l, Inc.*,

65

295 F. Supp. 2d 652, 672 (M.D. La. 2003). Thus, the requirement of good faith "applies only to obligations related to the specific contractual duties." *Innovative Sales, LLC v. Northwood Mfg., Inc.*, 2008 WL 3244114, \*4 (5th Cir., Aug. 6, 2008). Without proof that the party whose conduct at issue has failed to perform a specific contractual obligation, that party's good faith or bad faith is irrelevant. "[W]e do not examine a party's good faith (or bad faith) *unless and until* we find that the party has failed to perform an obligation, from which the obligor has sustained damages." *Favrot*, 68 So.3d at 1109 (emphasis in original).

83.    Stewart cannot point to any other contractual obligation that 111 Veterans has breached. Its generalized allegations that 111 Veterans breached its right to maintain peaceful enjoyment of the premises and acted in bad faith are not sufficient to sustain a breach-of-contract claim.

84.    Thus, even if the Court had found that Stewart was not in violation of Section 3(g) because AOP coverage was not reasonably obtainable at replacement cost levels, Stewart's breach of contract claim against 111 Veterans would still falter.

## B.    Stewart's Louisiana Unfair Trade Practice and Consumer Protection Act ("LUTPA") Claim

### 1.    Legal Framework

85.    The LUTPA prohibits the use of "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." LA. STAT. ANN. § 51:1405(A).

86.    "[T]he elements of a cause of action under the LUTPA are: (1) an unfair or deceptive trade practice declared unlawful; (2) that impacts a consumer, business

66

competitor or other person to whom the statute grants a private right of action; (3) which has caused ascertainable loss." *Flood v. Uber Techs., Inc.*, No. CV 18-4322, 2018 WL 3387536, at *4 (E.D. La. July 12, 2018) (quoting *Who Dat Yat LLC v. Who Dat? LLC*, No. 10-1333, 2011 WL 39043, at *3 (E.D. La. Jan. 4, 2011)).

87. "Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may bring an action individually . . . to recover actual damages." LA. STAT. ANN. § 51:1409.

88. "Business consumers and competitors are included in the group afforded a private right of action under the LUTPA." *Flood*, 2018 WL 3387536, at *4 (E.D. La. July 12, 2018) (internal quotations omitted).

89. The LUTPA does not specifically define an "unfair trade practice." "It has been left to the courts to decide, on a case-by-case basis, what conduct falls within the statute's prohibition." *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 2009-1633 (La. 4/23/10), 35 So.3d 1053, 1059 (citations omitted).

90. Courts have repeatedly held that a plaintiff must show conduct that "offends established public policy and . . . is immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Id.*, quoting M*oore v. Goodyear Tire & Rubber Co.*, 364 So.2d 630, 633 (La. App. 2 Cir. 1978).

91. "The range of prohibited practices under LUTPA is extremely narrow and includes only egregious actions involving elements of fraud, misrepresentation,

67

deception, or other unethical conduct." *IberiaBank v. Broussard*, 907 F.3d 826, 839 (5th Cir. 2018) (internal quotations omitted).

92.    In assessing a LUTPA claim, the "defendant's motivation" is a critical factor—his "actions must have been taken with the specific purpose of harming the competition." *Id.* at 839–40 (internal quotations omitted).

93.    As explained by the Fifth Circuit in *Turner v. Purina Mills, Inc*:

> LUTPA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions. The statute does not forbid a business to do what everyone knows a business must do: make money. Businesses in Louisiana are still free to pursue profit, even at the expense of competitors, so long as the means used are not egregious.

989 F.2d 1419, 1422 (5th Cir. 1993) (internal citation omitted).

94.    Moreover, "the statute does not provide an alternate remedy for simple breaches of contract. . . . There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes." *Id.* (internal citation omitted). But a "breach of a contract can have deceptive and unethical 'undertones' that would allow a LUTPA claim to stand in addition to the breach of contract claims." *First Am. Bankcard, Inc. v. Smart Bus. Tech., Inc.*, 178 F. Supp. 3d 390, 406 (E.D. La. 2016).

### *2.    111 Veterans Has Not Committed a LUTPA Violation*

95.    In post-trial briefing, Stewart clarifies that its LUTPA claim is not based on Jeffrey Feil's decision not to purchase the Building in 2022 and 2023, his business relationship with the Benson Group, his desire to convert the Building to residences, or his status as a competitor in the market. As Stewart points out, "Stewart and Mr.

68

Feil are competitors, and they can fairly compete in any number of ways." Rather, Stewart bases its LUTPA claim on "the deceptive and unfair actions taken by 111 Veterans and Mr. Feil (*i.e.*, stealing tenants, targeting the mortgage, improperly defaulting Stewart) to manufacture economic pressure and try to force a takeover of Stewart's Building." For the reasons that follow, Stewart's LUTPA claim fails.

96.    To begin, Stewart has no LUTPA claim for "improperly defaulting Stewart." Stewart was in violation of the insurance coverage requirements of Section 3(g). 111 Veterans acted within its rights under the lease to default Stewart based on its violation of the lease.

97.    Next, Stewart's claim fails to the extent it is predicated on 111 Veterans' efforts to steal its tenants using Stewart's rent roll. To be sure, 111 Veterans acted in an underhanded fashion when it shared Heritage Plaza's confidential rent roll with its commercial leasing broker and then encouraged the broker to use the rent roll to steal Heritage Plaza tenants. Whether such conduct constitutes an unfair or deceptive trade practice, the first element of a LUTPA claim, need not be decided. That is because Stewart's LUTPA claim fails on the second and third elements: Stewart fails to show that 111 Veterans' use of Stewart's rent roll "impact[ed]" Stewart to the extent it "caused ascertainable loss." *See Flood*, 2018 WL 3387536, at *4.

98.    The Metairie Class A office market has been stagnant for decades, with no new buildings coming online since the 1980's. Few new office tenants have entered the market. Accordingly, each of the buildings necessarily pursues the others' tenants

as part of their strategy to fill vacant space. Pursuing other buildings' tenants is, considered on its own, ordinary competitive behavior that is not proscribed by LUTPA. *Cheramie*, 35 So.3d at 1060.

99.    Stewart nonetheless points to Jeffrey Feil's transmission of the Heritage Plaza rent roll to the leasing agents at Corporate Realty as evidence of improper conduct. While some of the information on the rent roll was non-public and hence governed by the May 2022 Confidentiality Agreement between Feil and Stewart, some of the information was not confidential. The Confidentiality Agreement excludes from the term "Confidential Information" any information that "was known by or in the possession of the Recipient or its Representatives prior to being disclosed by or on behalf of the Disclosing Party pursuant to the Agreement." Thus, to the extent that any information in the rent roll was already in the possession of Feil or its agents, that information is not covered by the Agreement.

100.    The Court credits the undisputed testimony of Bruce Sossaman, the longtime Corporate Realty leasing agent at Lakeway, that he keeps an extensive personal database which tracks past unsuccessful proposals he has made to tenants of other buildings, including Heritage Plaza. That information includes the lease terms, expiration date, and square footage involved in the unsuccessful proposals, the most important data points for knowing when to approach a tenant in a competing building and what its space needs are likely to be. Indeed, other than some information about the tenants' respective expense bases, which he would not

normally track anyway, there was virtually nothing in the rent roll on Heritage Plaza's larger tenants that Sossaman did not already have.

101. Stewart complains that Feil benefitted from the confidential information in the rent roll in making its outreach to Carr Riggs and Audubon Engineering. The evidence shows otherwise. The Court credits Sossaman's uncontested testimony that Carr Riggs' broker initially approached Sossaman unsolicited in 2020, four years before its Heritage Plaza lease was due to expire. As it was too early then to negotiate toward a 2024 lease, Sossaman put the discussions on hold, renewing them in 2022. He then put together a proposal that included Lakeway's standard rental rate, making little to no use of Heritage Plaza's rent roll. After a series of proposals and counterproposals, Carr Riggs reached an agreement with Lakeway on a lease that commenced in the spring of 2024. Significantly, Stewart offered no evidence of any of its own negotiations with Carr Riggs—indeed, Carr Riggs' approach to Sossaman in 2020 suggests Carr Riggs had decided years ago to leave Heritage Plaza upon the expiration of its lease.

102. Sossaman's testimony on this score is corroborated by records presented at trial. In an email from Sossaman to Siegel dated May 26, 2022 (approximately two weeks after Corporate Realty received the rent roll), Sossaman reported on his discussion with Carr Riggs, noting that he had spoken to Carr Riggs' broker and they were "agreeable to starting process in about 90 days." Sossaman further noted that he was "[w]aiting for feedback on size, *in 2020 they were 20k [rentable square foot], curious to see how big now.*" Sossaman's reference to the size of Carr Riggs' office

footprint in 2020 supports Sossaman's assertion that he already possessed information about Carr Riggs and, more importantly, that he was already in discussions with Carr Riggs' broker in 2020.

103.    Moreover, in a memorandum to the Feils dated September 7, 2022, proposing lease terms for Carr Riggs to move to Lakeway III, Sossaman noted that Carr Riggs is "located at Heritage Plaza, expiring March 31, 2024, *we toured them a year ago,* but their expiration date was too far out."[211] Going by the date of the memorandum, the Carr Riggs tour of Lakeway III would have occurred likely in 2021, which is before Sossaman received the Heritage Plaza rent roll. This memorandum supports Sossaman's testimony that he had been attempting to lure Carr Riggs to the Feil properties long before the Feils tasked him to do so in 2022.

104.    Furthermore, Audubon's broker, Martin Miller, contacted Sossaman prior to May 2022, telling Sossaman that he would be sending an RFP (request for proposal) when Audubon's lease expiration date approached. Miller sent Sossaman an email on March 13, 2023 seeking information about the availability of 35,000 square feet of office space, noting that Audubon's lease was expiring in October 2024. In response, Sossaman prepared a proposal, again using Lakeway's standard rental rate and using no information from the rent rolls. This time however, the negotiations were not successful, with Audubon opting to renew at Heritage Plaza. Stewart fails to show how, if at all, Sossaman used Heritage Plaza's rent roll in its discussions with

---

[211] 111 Vets Exh. 33.

Audubon, much less connect how Sossaman's acquisition of the rent roll resulted in Stewart's decision to offer Audubon a discount in order to keep its tenant.

105. Stewart nonetheless contends that the emails between and among Feil and Corporate Realty tell the true story of the value of the rent roll. Efforts to keep the rent roll "confidential," emails pressuring "King Siegel" to use the rent roll to Feil's advantage, and discussions of using the rent roll to "steal" a client all paint a picture of Feil using unfair tactics to lure Stewart's tenants. The value of the rent roll information was corroborated by testimony of Sterbcow and Stone, describing the rent roll as the "holy grail of information."

106. To be sure, Feil's conduct—sharing the rent roll and then placing unyielding pressure on its brokers to use the rent roll to steal Stewart's tenants—is deserving of criticism. Competitor or not, Feil sought to exploit nonpublic information that it obtained through Stewart's good-faith attempt to sell the Building to Feil. Feil betrayed Stewart in an effort to gain an upper hand in Metairie's hard-nosed commercial real estate market.

107. But a LUTPA violation is not triggered every time a company behaves badly towards a competitor—or more to the point, every time a company *attempts* to take advantage of a competitor through alleged deceptive practices. To recover under LUTPA, a plaintiff must show an "ascertainable loss" that is a "*result* of the use or employment" of the unfair or deceptive practice. LA. STAT. ANN. § 51:1409 (emphasis added). If the plaintiff cannot show that the unfair practice impacted the plaintiff and caused a loss, the LUTPA claim cannot succeed. *See Redmellon, L.L.C v. Halum*, No.

73

2:23-CV-5754, 2025 WL 932397, at *16 (E.D. La. Mar. 27, 2025) (Guidry, J.), appeal dismissed sub nom. *Redmellon, L.L.C. v. 1001 Canal, L.L.C.*, No. 25-30256, 2025 WL 3002989 (5th Cir. June 6, 2025) ("When the conduct does not cause a loss of money or property, there is no LUTPA claim."); *CheckPoint Fluidic Sys. Int'l, Ltd. v. Guccione*, No. CIV.A. 10-4505, 2011 WL 3268386, at *10 (E.D. La. July 28, 2011) (Vance, J.) (dismissing LUTPA claims when plaintiffs fail to show the alleged improper conduct resulted in actual loss of business or other identifiable damage).

108.    As shown by the evidence, Feil's aggressive attempts to steal Heritage Plaza tenants for its own buildings were not unusual in the Metairie commercial real estate market. Sossaman, an experienced broker, possessed the key information from the rent roll before receiving it. Stewart presented no evidence that Corporate Realty successfully used rent roll information to gain advantage over Heritage Plaza in the leasing of its space. Legitimate competition for tenants, particularly Carr Riggs and Audubon, is not evidence of a LUTPA violation.

109.    Stewart points out that the timing of Feil's decision to share the rent roll is "damning," considering it occurred at a time when Feil and Stewart were in discussions for Feil to purchase Heritage Plaza.[212] It is clear that Feil sought to squeeze Stewart by stealing Stewart's tenants, driving up Stewart's operating and insurance costs, and making it difficult for Stewart to refinance its mortgage, all in hopes of defaulting Stewart or, at worst, purchasing Heritage Plaza at a discount.

---

[212] ECF No. 100 at 8.

110.    Regardless of its motivations, the Feil Organization did not breach the lease when it defaulted Stewart. Stewart was in fact in violation of the lease for failing to secure AOP coverage consistent with its obligations under Section 3(g). 111 Veterans was within its authority, under the terms of the lease, to default Stewart. And while Feil violated its confidentiality agreement with Stewart by forwarding Stewart's rent roll to its brokers, Stewart has not shown that the rent roll caused Stewart's loss of Carr Riggs as a tenant or resulted in Stewart providing Audubon a discount. For these reasons, Stewart has failed to prove its LUTPA claim by a preponderance of the evidence.[213]

## IV.    CONCLUSION

The Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and 28 U.S.C. § 2202, permits a federal court, where jurisdiction exists over an actual controversy, to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

The Court finds that Stewart is *not* entitled to the following declaratory judgments as requested in its complaint:[214]

---

[213] While this verdict does not call for the awarding of damages, the Court nonetheless finds that treble damages would not have applied because the alleged unfair or deceptive practices outlined in Stewart's complaint, filed on June 15, 2023, occurred before 111 Veterans was put on notice by the Attorney General via June 27, 2023 letter.

[214] ECF No. 1.

a. That the amount of insurance demanded by Ground Lessor is not reasonably obtainable;

b. That the previous limits of insurance obtained by Stewart were reasonably obtainable and did not result in a breach of the Ground Lease because Stewart acted in good faith, obtained insurance that was reasonably obtainable and economically sustainable and which protected the interest of Ground Lessor;

c. That the failure to obtain the limits of insurance demanded by Ground Lessor were not a breach and such limits were not enforceable and thus as long as the prior limits are in place, Ground Lessor can take no action to dissolve the Ground Lease, or evict or take other adverse action against Stewart with regard to the insurance limits in Section 3(g) of the Ground Lease;

d. By accepting the lower limits obtained by Stewart and not objecting for several years, Ground Lessor is estopped from or has waived any objection to the insurance limits obtained by Stewart and through its course of conduct in not objecting as modified the Ground Lease;

e. That the added coverage acquired by Ground Lessee was unnecessary and Stewart can terminate the policy at will and not be forced to continue or to renew such added coverage in the future.

The Court finds that 111 Veterans is entitled to the following modified declaratory judgments:

76

a. The coverage limits of both the property policy that was in place as of March 16, 2023 and the renewal (captive cell) policy that went into effect on May 29, 2023 fail to provide loss limits for all-other-perils coverage at the level required by Section 3(g) of the Fourth Amendment of Ground Lease;

b. The Stewart Development Protected Cell policy put in place on May 29, 2023 does not remedy the coverage shortfalls of the primary policy because it is a form of self-insurance and not coverage provided by a financially sound and reputable insurer;

c. Even if the coverage limits and deductible cap required by Section 3(g) of the Fourth Amendment of Ground Lease for non-flood property insurance are conditioned by the phrase 'if reasonably obtainable,' such coverage for all other perils was available on March 16, 2023 and May 29, 2023.

The Court finds that 111 Veterans is not entitled to the following declaratory judgments as requested in its Answer and Counterclaim:

a. The coverage limits and deductible cap required by Section 3(g) of the Fourth Amendment of Ground Lease for non-flood property insurance are not conditioned or otherwise qualified by the phrase "if reasonably available," which applies only to Stewart's obligations under Section 3(g) with respect to flood insurance.

Moreover, because Stewart has failed to establish by a preponderance of the evidence that 111 Veterans committed a breach of contract or a LUTPA violation, the Court finds that 111 Veterans is not liable to Stewart. Accordingly, the Court renders judgment in favor of 111 Veterans.

New Orleans, Louisiana, this 31st day of March, 2026.

_____
BRANDON S. LONG
UNITED STATES DISTRICT JUDGE